## In re EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Petitioner.

### No. 83–2284.

United States Court of Appeals,
Fifth Circuit.

July 11, 1983.

Rehearing and Rehearing En Banc Denied
Aug. 29, 1983.

Joe J. Fisher, U.S. Dist. Judge, Beaumont, Tex., Bob Wortham, U.S. Atty., Tyler, Tex., Vinson & Elkins, Douglas E. Hamel, Houston, Tex., for appellee.

Before RUBIN, RANDALL and JOLLY, Circuit Judges.

RANDALL, Circuit Judge:

This Equal Employment Opportunity Commission subpoena enforcement action comes to us on a petition for a writ of mandamus. The district court ordered the Commission to submit to extensive discovery and Commissioner Rodriguez to give an oral deposition as conditions precedent to the enforcement of the subpoena. We grant the writ because we find that, under the circumstances of this case, the district court's orders exceeded its authority.

We have already recounted the facts of this case in an earlier opinion. *EEOC v. Neches Butane Products Co.,* 704 F.2d 144 (5th Cir.1983). Briefly, these proceedings began in late 1978 or early 1979 when the Commission's computerized statistical profiles of various Houston businesses revealed that Neches Butane Products Company ranked suspiciously low in the hiring of blacks, hispanics, and women. The Commissioner to whom the case had been randomly assigned for review, Armando Rodriguez, recommended the issuance of a Commissioner's charge under sections 706 and 707 of title VII, 42 U.S.C. §§ 2000e–5, –6 (1976). *See* E.E.O.C.Compl.Man. (CCH) ¶ 563, § 16.3(e) (1979) (proposed charges are submitted to commissioners on a "rotating basis").

The resulting investigation did not go smoothly. Because the Company refused to comply with any of the Commission's requests for documents, the Commission was forced to bring a subpoena enforcement action in the Eastern District of Texas pursuant to section 710 of title VII, 42 U.S.C. § 2000e–9 (1976). The Company then de-

Vincent Blackwood, Washington, D.C., for E.E.O.C.

fended, and continues to defend, its refusal to comply with the requests primarily on the ground that the Commission's discrimination action had been wrongfully instituted: the Company alleged that Commissioner Rodriguez had signed the charge because he had been improperly influenced by the League of United Latin American Citizens, which, in turn, had been influenced by a disgruntled Company employee (A.J. Albarado) who wished to pursue a personal vendetta against the Company. In order to substantiate its allegations, the Company requested various documents concerning the Commission's decision to bring the charge, and asked to take Commissioner Rodriguez's deposition. The district court noted that the Company had apparently raised a "substantial question" concerning the Commission's good faith in bringing the charge, and therefore granted the Company's motion to compel discovery.

This time it was the Commission's turn to refuse to comply with a discovery order. The Commission argued that—in the absence of truly extraordinary circumstances not present here—the transformation of summary enforcement proceedings under section 710 into extensive discovery and counterdiscovery battles would destroy the enforcement mechanism of title VII. The district court rejected this as well as several subsidiary arguments, and ruled on July 1, 1981, that the Commission should not be allowed to proceed with its subpoena enforcement action until the Company was afforded an opportunity to take discovery. The Company, said the district court, should have a chance to inquire into the legitimacy of the Commission's motives in bringing the discrimination charge in the first place. The court then "stay[ed] the [subpoena enforcement] proceedings until such time as the EEOC complie[d] with the Court's [discovery] Order."

The Commission now seeks a writ of mandamus directing the district court to vacate its order compelling counterdiscovery, to vacate its stay order, and to proceed expeditiously to resolve the underlying subpoena enforcement action.

## I. THE PROPRIETY OF MANDAMUS.

■ This case originally came to us under 28 U.S.C. § 1291 as an appeal from a purportedly final order. Although we then held that we did not have jurisdiction to hear the merits of the case, we suggested that if the Commission wished to pursue the matter, it should submit a petition for mandamus presenting the same issues within thirty days. 704 F.2d at 152 & n. 7. The Commission has now submitted such a petition within the time allowed, and the Company has filed a brief in opposition. *See* Fed.R.App.P. 21; Local Rule 21. We therefore consider whether we should exercise our discretion under the All Writs Act, 28 U.S.C. § 1651 (1976), and hear the merits of the Commission's petition.

Although the Company correctly observes that mandamus has historically been a drastic remedy generally reserved for really "extraordinary" cases, *see, e.g., Kerr v. United States District Court,* 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976); *Bankers Life & Casualty Co. v. Holland,* 346 U.S. 379, 385, 74 S.Ct. 145, 149, 98 L.Ed. 106 (1953), the federal courts of appeals (as well as the Supreme Court) have shown an increasing willingness in recent years to use the writ as a one-time-only device to "settle new and important problems" that might have otherwise evaded expeditious review. *Schlagenhauf v. Holder,* 379 U.S. 104, 111, 85 S.Ct. 234, 239, 13 L.Ed.2d 152 (1964). As the District of Columbia Circuit explained in *Colonial Times, Inc. v. Gasch, "Schlagenhauf* authorizes departure from the final judgment rule when the appellate court is convinced that resolution of an important, undecided issue will forestall future error in trial courts, eliminate uncertainty and add importantly to the efficient administration of justice." 509 F.2d 517, 524 (D.C.Cir.1975). *Accord, United States v. Hughes,* 413 F.2d 1244, 1248–49 (5th Cir.1969), *vacated as moot sub nom. United States v. Gifford-Hill-American, Inc.,* 397 U.S. 93, 90 S.Ct. 817, 25 L.Ed.2d 77 (1970); *SEC v. Krentzman,* 397 F.2d 55, 59 (5th Cir.1968); *see generally* 16 C. Wright, A. Miller & E. Cooper, *Federal*

*Practice and Procedure* § 3934 (1977 & Supp.1983) (section entitled "Supervisory and Advisory Mandamus").

The present case, as Part II of this opinion will show, meets all of the *Schlagenhauf* requirements. The substantive issue presented is one of first impression in this circuit and directly concerns the efficiency and dispatch with which the Commission will be able to carry out its mandate under title VII. The Sixth Circuit has held that *Schlagenhauf*-type mandamus was appropriate in a case very similar to the present one. *EEOC v. K-Mart Corp.*, 694 F.2d 1055, 1060–61 (6th Cir.1982) (mandamus issued to prevent district court from making EEOC commissioner submit to deposition as condition precedent to enforcement of EEOC subpoena). In the present case, moreover, the district court not only coupled its discovery order with an order to stay all further proceedings, but also refused to dismiss the suit, thus rendering the discovery order not appealable unless the Commission first submitted Commissioner Rodriguez to examination. *See* 704 F.2d at 146. We therefore think that this is an appropriate case for what the commentators have come to call "supervisory" or "advisory" mandamus. *See, e.g.,* 16 C. Wright, A. Miller & E. Cooper, *supra,* § 3934.

Because this case comes to us in the form of a petition for a writ of mandamus, our review of the district court's order is necessarily limited. The writ is appropriately issued only "when there is 'usurpation of judicial power' or a clear abuse of discretion," *Schlagenhauf, supra,* 379 U.S. at 110, 85 S.Ct. at 238 (citation omitted), and "the party seeking [it] has 'the burden of showing that its right to issuance of the writ is "clear and indisputable." ' " *Will v. United States,* 389 U.S. 90, 96, 88 S.Ct. 269, 274, 19 L.Ed.2d 305 (1967) (citations omitted). Translated into the language of the present case, our standard of review requires us to issue the writ only if we find that the district court's exercise of its discretion in issuing the discovery order is inconsistent with the overall design of title VII and with the specific purpose of section 710. In the words of the Sixth Circuit, we must find

that "[t]he district court's order exceeds the narrow scope of authority a district court has in summary subpoena enforcement proceedings and is inconsistent with the enforcement scheme of Title VII." *K-Mart, supra,* 694 F.2d at 1064.

Finally, and as we had occasion to note in a previous supervisory or advisory mandamus case, "[t]he appropriateness of the writ in this particular instance is not to be construed as making mandamus appropriate in subsequent cases in which the principles . . . set forth in this opinion are applied." *Hughes, supra,* 413 F.2d at 1249. Indeed, the very purpose of the present "exercise of our 'expository and supervisory functions,' " as we then observed, is to meet "the compelling need to settle a new issue so that it can become only an ordinary issue." *Hughes, supra,* 413 F.2d at 1249 (citations omitted); *accord, Krentzman, supra,* 397 F.2d at 59. With that important caveat, we now establish the standard that should govern the exercise of a district court's discretion in passing on a counterdiscovery request in an EEOC subpoena enforcement action.

## II. THE APPROPRIATE STANDARD.

■ The statutory provision that governs this case, section 710 of title VII, reads in its entirety: "For the purpose of all hearings and investigations conducted by the Commission or its duly authorized agents or agencies, section [11 of the National Labor Relations Act] shall apply." 42 U.S.C. § 2000e–9 (1976). To give meaning to section 710, we must therefore look, first, to the history and purpose of title VII and of section 11 of the NLRA, and second, to the applicable case law.

### A. *Title VII and Section 11 of the NLRA.*

Title VII was originally enacted "to eliminate, through the utilization of formal and informal remedial procedures, discrimination in employment based on race, color, religion, [sex,] or national origin." H.R. Rep. No. 914, 88th Cong., 1st Sess. 26 (1963),

*reprinted in* 1964 U.S.Code Cong. & Ad. News 2355, 2391, 2401, *and in* EEOC, *Legislative History of Titles VII and XI of the Civil Rights Act of 1964,* at 2001, 2026 (1968). In the eyes of Congress, discrimination was, and continues to be "an urgent and most serious national problem." *Id.* at 18, 1964 U.S.Code Cong. & Ad.News at 2394, *Legislative History of Title VII* at 2018. Even so, the original enforcement scheme of title VII proved unsatisfactory, and was replaced eight years later in the Equal Employment Opportunity Act of 1972. Congress then commented:

> Despite the commitment of Congress to the goal of equal employment opportunity for all our citizens, the machinery created by the Civil Rights Act of 1964 is not adequate.

> Despite the progress which has been made since passage of the Civil Rights Act of 1964, discrimination against minorities and women continues. The persistence of discrimination, and its detrimental effects require a reaffirmation of our national policy of equal opportunity in employment. It is essential that seven years after the passage of the Civil Rights Act of 1964, effective enforcement procedures be provided the Equal Employment Opportunity Commission to strengthen its efforts to reduce discrimination in employment.

H.R.Rep. No. 238, 92d Cong., 2d Sess. 3 (1971), *reprinted in* 1972 U.S.Code Cong. & Ad.News 2137, 2139, *and in* Senate Comm. on Labor and Public Welfare, *Legislative History of the Equal Employment Opportunity Act of 1972,* at 61, 63 (1972). The so-called "demand power" that the Commission had during its investigations was in particular need of strengthening. The 1972 Congress therefore replaced it with the present section 710, which was designed to "simplif[y] procedures for subpoenaing witnesses or records by providing the same investigative authority as is contained in [section 11 of] the National Labor Relations Act." S.Rep. No. 681, 92d Cong., 2d Sess. 19 (1972) (Conference Report), *reprinted in* 1972 U.S.Code Cong. & Ad.News 2179, 2184, *and in Legislative History of the EEOA,*

*supra,* at 1800, 1817. An analysis of the purpose and history of the current section 710, then, leads unavoidably to the conclusion that the Congress that enacted it was principally concerned with "simplif[ying] procedures" so that title VII could be more effectively enforced.

An analysis of the purpose and history of section 11 of the NLRA leads to the same conclusion. The text of section 11 is very general and provides us with no guidance on the point before us today. Section 11, as the various committee reports on it and its predecessors commented, does nothing more than grant to the agency "the subpoena powers typically provided for similar administrative bodies, without which their work would be ineffectual." H.R.Rep. No. 1147, 74th Cong., 1st Sess. 25 (1935), *reprinted in* 2 NLRB, *Legislative History of the National Labor Relations Act, 1935,* at 3076 (1949). *See also* H.R.Rep. No. 972, 74th Cong., 1st Sess. 22 (1935), *reprinted in* 2 *Legislative History of the NLRA, supra,* at 2978–79 (same); H.R.Rep. No. 969, 74th Cong., 1st Sess. 22 (1935), *reprinted in* 2 *Legislative History of the NLRA, supra,* at 2932 (same). The text of section 11 thus leaves unresolved the inherent tension between speed and administrative efficiency on the one side, and various "process" concerns on the other. And it is this tension that lies at the heart of the present suit.

The drafters of the Wagner bill—which, after considerable amendment, became the National Labor Relations Act—appear to have been well aware of this tension. Professor Milton Handler, who was General Counsel to the first (and embryonic) "National Labor Board" and who testified in support of the bill, put the matter succinctly: "Enforcement, to be effective, must be speedy." *To Create A National Labor Board: Hearings before the [Senate] Comm. on Education and Labor,* 73d Cong., 2d Sess. 36 (1934), *reprinted in* 1 *Legislative History of the NLRA, supra,* at 27, 66. In explaining the operation of what eventually became section 11 of the Act, Professor Handler went on to resolve the tension deci-

sively, we think, in favor of speed and efficiency:

> The power to compel the attendance of witnesses and the production of books and papers is no broader than those habitually conferred upon administrative bodies. The complaint must state the general nature of the offense charged. The complaint may be amended during the hearing—but so may court pleadings under our modern procedure in the absence of surprise.... Effective administrative action requires an informal procedure, but the right of court review adequately protects against any abuse of power.

*Id.* at 37, 1 *Legislative History of the NLRA, supra,* at 67. Proceedings under section 11 were designed to be "informal" and fast.

The choice of speed over process cannot, however, be absolute. Even the Commission concedes that at some point a civil rights defendant's allegation of illegal purpose could become serious enough to warrant pre-subpoena enforcement discovery. The dispute between the parties thus centers on the formulation of the appropriate standard. With the legislative history of sections 11 and 710 in mind, we turn to that question.

B. *The Applicable Case Law and the Emergence of a Standard in EEOC Proceedings.*

1. *The IRS Summons Enforcement Cases.*

The Company argues that the relatively liberal discovery standard set out in the tax summons cases should apply to the present case. *See, e.g., United States v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *Donaldson v. United States,* 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *United States v. Southeast First National Bank,* 655 F.2d 661 (5th Cir.1981); *United States v. Harris,* 628 F.2d 875 (5th Cir.1980) (with a careful analysis of the earlier cases); *United States v. Wright Motor Co.,* 536 F.2d 1090 (5th Cir.1976); *United States v. Newman,* 441 F.2d 165 (5th Cir.1971); *United States v. Roundtree,* 420 F.2d 845 (5th Cir.1969). We disagree. The issue in the tax cases has most often been the "institutional" bad faith of the Internal Revenue Service in issuing a summons, 437 U.S. at 316, 98 S.Ct. at 2367, and in order to obtain at least limited preenforcement discovery on that issue, all a defendant need do is make a bare "allegation of improper purpose." 655 F.2d at 667. (The "discovery" is actually an opportunity to question Service officials in open court.) This low-threshold "allegation of improper purpose" standard, we think, cannot apply in EEOC subpoena enforcement proceedings for at least four separate and independent reasons.[1]

First, as intimated above, the "discovery" to which the low standard in the Fifth Circuit tax cases applies is not discovery in the usual sense, but rather a chance to question Service officials at a subpoena enforcement hearing. *Cf. United States v. Kis,* 658 F.2d 526, 539 (7th Cir.1981) (even more limited version of preenforcement discovery than that allowed by Fifth Circuit), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *United States v.*

---

**1.** There is also one additional reason why the IRS summons cases should not control the outcome of the present litigation. While tax investigations may be begun at the discretion of the Service, *see* I.R.C. § 7602 (1976), the kind of EEOC investigation at issue here may be begun only upon the issuance of a charge "in writing under oath or affirmation" by one of the commissioners. Title VII, § 706(b), 42 U.S.C. § 2000e–5(b) (1976). *See* 118 Cong.Rec. 7167 (1972) (prepared remarks of Sen. Williams on behalf of the House-Senate Conference Committee) ("Charges (whether by or on behalf of an aggrieved person or a member of

the Commission) must be in writing and under oath or affirmation ...."), *reprinted in Legislative History of the EEOA, supra,* at 1845. While it is not entirely beyond the realm of possibility that a high governmental official would perjure himself, the "under oath or affirmation" requirement does afford potential EEOC defendants *some* protection that potential IRS defendants may not always have. Consequently, it seems reasonable that the threshold for obtaining pre-subpoena enforcement discovery in EEOC cases should be higher than that in IRS cases.

*Garden State National Bank,* 607 F.2d 61, 71 (3d Cir.1979) (same). If it then appears that more formal (and time-consuming) discovery devices would be appropriate, the district court may enter the necessary order. Depositions, interrogatories, and the rest of the panoply of expensive and time-consuming pretrial discovery devices may *not* be resorted to as a matter of course and on a mere "allegation of improper purpose." *See Southeast First National Bank, supra,* 655 F.2d at 667–68; *Harris, supra,* 628 F.2d at 883 (expressly rejecting any hints to the contrary in the earlier cases). Since the present case concerns the right to depose an EEOC commissioner—bringing him to the Eastern District of Texas for a hearing would presumably be entirely out of the question—and does not at all concern the kind of preliminary enforcement hearing at issue in *Southeast First National Bank* and *Harris,* the IRS summons cases would appear to have little bearing on the present suit.

Second, the present litigation principally concerns the availability of an agency head for deposition, and not the availability of lower-level local agents. The vast majority of the tax cases do not concern the propriety of deposing the Commissioner of Internal Revenue. The standard for deposing an agency head should be higher than that for deposing local agents: the efficiency of the EEOC would suffer terribly if its commissioners were subject to deposition in every routine subpoena enforcement proceeding.

Third, although time is clearly of the essence in all administrative litigation, the issue is not quite so critical in the IRS cases as it is in the EEOC cases. In civil tax cases, the principal issue is the money allegedly owed the government. No matter

how long the precollection delay, the government is at least partly reimbursed for the time value of its money through the imposition of a semiannually adjusted interest charge. *See* I.R.C. §§ 6601, 6621 (West Supp.1983) (rate pegged to "prime rate" to be established by Commissioner every Sept. 30 and Mar. 31). In an EEOC discrimination case, on the other hand, unnecessary delay is less easily remedied and "[e]nforcement, to be effective" must be especially "speedy." [2] It is beyond challenge that "the very backbone of an administrative agency's effectiveness in carrying out [its] congressionally mandated duties ... is the *rapid exercise* of the power to investigate." *FMC v. Port of Seattle,* 521 F.2d 431, 433 (9th Cir.1975) (emphasis added). In turn, "[t]his important governmental interest in the expeditious investigation of possible unlawful activity would be undermined if a party could use a subpoena enforcement action to raise the full panoply of objections to an administrative proceeding." *FTC v. Anderson,* 631 F.2d 741, 745 (D.C.Cir.1979). In an EEOC case, time is not just money. It is the welfare of those very citizens whom Congress directed the Commission to protect. We therefore think that the courts in EEOC cases should tolerate delay at the subpoena enforcement stage only in the most unusual circumstances—and the tax cases afford us little guidance in defining those circumstances.

And most important, finally, the pre-subpoena enforcement discovery standards established in *LaSalle, supra,* and in the Fifth Circuit tax cases have been legislatively modified in favor of the Service by section 333 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, § 333, 96 Stat. 324, 622 (1982) (codified at I.R.C.

---

2. *See* Section II.A, second-to-last paragraph, *supra.* In a somewhat similar context, the District of Columbia Circuit has commented:

> Unlike the IRS, which can postpone collection of taxes for the duration of parallel criminal proceedings without seriously injuring the public, the SEC must often act quickly, lest the false or incomplete statements of corporations mislead investors and infect the markets.... For the SEC to stay its hand might well defeat its purpose.

*SEC v. Dresser Industries, Inc.,* 628 F.2d 1368, 1380 (D.C.Cir.), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980); *accord, United States v. Bell,* 564 F.2d 953, 958–59 (Em. App.1977) (refusing to apply in DOE subpoena case standards developed in IRS cases). The real point is that principles established in tax cases, and most notably in *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), cannot be indiscriminately applied to other agencies.

§ 7602 (West Supp.1983)). The then current rule, according to the relevant committee report, had "spawned protracted litigation without any meaningful results for the taxpayer." S.Rep. No. 494, 97th Cong., 2d Sess. 285, *reprinted in* 1982 U.S.Code Cong. & Ad.News 781, 1031. And yet, the committee went on to observe, *"summons enforcement proceedings should be summary in nature and discovery should be limited."* *Id.,* U.S.Code Cong. & Ad.News at 1031 (emphasis added). The committee also cited with approval *United States v. Kis,* wherein the court observed:

> In discussing the relative burdens of the parties in summons enforcement actions, we cannot stress too emphatically that these proceedings are intended to be summary in nature. They occur, after all, at only the investigative stage of any action against a taxpayer, and no guilt or liability on the part of the taxpayer is established. . . . [T]he burden on the taxpayer to prove Government wrongdoing is [therefore] significantly greater than that on the Government to show its legitimate purposes. The action should be concluded quickly, so that the investigation may advance toward the ultimate determination of civil or criminal liability, if any.

658 F.2d 526, 535 (7th Cir.1981) (footnote omitted), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). In order to establish a bright-line rule that would substantially reduce the wasteful pre-subpoena enforcement discovery and delay so evident in many of the earlier tax cases, Congress added current Code subsections 7602(b) and (c), which significantly "expand the purposes for which an administrative summons may be issued by the Internal Revenue Service." S.Rep. No. 494, *supra,* at 286, U.S.Code Cong. & Ad.News at 1031. Although the details of the new tax summons law are unimportant here,[3] the point remains that the relatively liberal preenforcement discovery standards that the Company urges us to apply in this EEOC case have proven so unsatisfactory even in the IRS cases that Congress has changed the law. We think that "discovery should be limited" in *any* subpoena enforcement proceeding and that the approach of *La-Salle* and the Fifth Circuit tax cases should certainly not be imported into the EEOC cases.

*2. The Standard in EEOC Cases.*

It remains for us to establish, however, the approach that *should* be used in EEOC subpoena enforcement proceedings. We recognize at the outset that facts vary so much from case to case that it is often very difficult to articulate a single general standard. *See, e.g., Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970) (warning against "too sweeping utterances" that seem "clear in relation to ... particular cases but have limited meaning as general principles"). Nevertheless, we think that it is possible to fashion at least an approach, if not a hard-and-fast "general rule" that can be used in similar EEOC subpoena enforcement cases.

Because we think that the two-step procedure followed in this case was sound and should be generally followed in all EEOC subpoena enforcement cases in this circuit, our approach is best understood in the procedural context of this case. *Cf. Kis, supra,*

---

**3.** The relevant parts of the new law read:

The purposes for which the Secretary may [issue a summons] include the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws. . . .

No summons may be issued under this title, and the Secretary may not begin any action under section 7604 to enforce any summons, with respect to any person if a Justice Department referral is in effect with respect to such person.

TEFRA § 333, I.R.C. § 7602(b)–(c) (West Supp. 1983). *See* H.R.Rep. No. 760, 97th Cong., 2d Sess. 584 (Conference Report), *reprinted in* 1982 U.S.Code Cong. & Ad.News 1190, 1356. Under the old law, the Service's intent to bring a criminal, rather than a civil suit was the key issue; but the new law uses a bright-line test: the Service's intent is conclusively deemed to be "civil" unless and until the case is actually referred to the Justice Department for criminal prosecution. The issue of institutional intent, with all of its complexities, thus appears to have been largely removed from the IRS summons enforcement cases in order that the Service may more speedily carry out its congressional mandate.

658 F.2d at 543–44 (procedure in IRS summons case); *SEC v. Wheeling-Pittsburgh Steel Corp.,* 648 F.2d 118, 126 (3d Cir.1981) (SEC subpoena) (citing *United States v. McCarthy,* 514 F.2d 368, 372–73 (3d Cir. 1975) (IRS summons)).

The Commission first submitted a petition for enforcement that fully complied with the informal guidelines set out in *Powell:*

> [The agency] must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the [agency's] possession, and [4] that the administrative steps required by the [agency's statute or rules] have been followed.

379 U.S. at 57–58, 85 S.Ct. at 255. *See, e.g., K-Mart, supra,* 694 F.2d at 1066 (applying the *Powell* criteria in EEOC case); *EEOC v. University of Pittsburgh,* 643 F.2d 983, 985 (3d Cir.) (same), *cert. denied,* 454 U.S. 880, 102 S.Ct. 362, 70 L.Ed.2d 190 (1981). The government generally complies with the *Powell* requirements, as it did here,[4] through the simple submission of appropriate affidavits. *See, e.g., Kis, supra,* 658 F.2d at 536 ("No more than that is necessary to make the *prima facie* case.") (footnote omitted).

The second procedural step was a little more complicated. After the Commission made its *Powell* showing, the burden shifted to the Company to come forward and show that there was a significant enough

chance that the Commission was abusing its investigative authority, *i.e.,* that it was not complying with the *Powell* guidelines, that discovery on that question was warranted. The principal question presented to us today concerns the nature of this second-stage showing.

Our starting point must be the purpose, history, and administrative interpretation of the statute in issue, section 710 of title VII. Here, we think that this kind of analysis (already undertaken in Section II.A, *supra*) can only lead to a conclusion that an administrative defendant's second-stage burden should be relatively heavy. Since as a general matter a defendant is not "entitled to engage in counter-discovery to find grounds for resisting" a subpoena, agency personnel, and especially commissioners, should be deposable "[o]nly in the 'exceptional' case." *United States v. Litton Industries, Inc.,* 462 F.2d 14, 17 (9th Cir.1972). Such a case is one where the defendant "makes a preliminary and substantial demonstration of abuse," *K-Mart, supra,* 694 F.2d at 1067 (quoting *United States v. Will,* 671 F.2d 963, 968 (6th Cir.1982)), that is, where the defendant has presented "meaningful evidence" that the agency is attempting to abuse its investigative authority, *SEC v. Howatt,* 525 F.2d 226, 229 (1st Cir.1975).[5] Anything short of this showing is not enough: because dilatory tactics at the subpoena enforcement stage of a discrimination suit brought under title VII are absolutely unacceptable, discovery may be had only after a *substantial* demonstration of abuse based on *meaningful* evidence.[6]

---

**4.** The Commission submitted affidavits from the Houston District Office investigator assigned to the case, Marsha Kamlar, from the Director of that office, Harriet Joan Ehrlich, and from Commissioner Rodriguez. The first two affidavits appear to be typical examples of their kind; however, the third seems to have been made entirely to deny the Company's charges of investigatory abuse (which had also been made at the administrative level of the proceedings).

**5.** We emphasize that a "preliminary and substantial demonstration of abuse," supported by "meaningful evidence," does *not* mean actual proof. As the Seventh Circuit commented in *Kis,*

> [a]ll the [defendant] needs to do is develop facts from which a court might *infer a possibility* of some wrongful conduct by the Government. He need not be able to prove that the wrongful conduct in fact exists. 658 F.2d at 540 (emphasis in original).

**6.** The legal standard—borrowed from the tax cases—is sometimes phrased in terms of a "substantial question." *See, e.g., Powell, supra,* 379 U.S. at 51, 85 S.Ct. at 251 ("[T]he Government need make no showing of probable cause to suspect fraud unless the taxpayer raises *a substantial question* that judicial enforcement of the administrative summons would be an abusive use of the court's process."). Indeed, the district court in this case

## III.  APPLYING THE STANDARD.

■  It now remains for us to determine whether the Company has made a substantial demonstration of abuse based on meaningful evidence in this case.  For the reasons set out below, we find that the district court has clearly transgressed the limits imposed upon its discretion by section 710 of title VII—the statute that governs subpoena enforcement proceedings in the district courts.

The Company relies exclusively upon an affidavit by one whose name remains under seal.[7]  The affiant states that he heard one Mrs. A.J. Albarado say that her husband did not need to proceed with his individual discrimination claim against the Company because he "had friends in [the] League of United Latin American Citizens who could get a big-wig commissioner in Washington to· make sure the company paid" (abbreviation expanded).  The affiant then says that Mr. Albarado agreed with what his wife had said.  This portion of the affidavit

clearly does nothing to assist the Company in carrying its second-stage burden.  In urging upon us the contrary position, the Company has assumed that the possibly vindictive motives of Mr. Albarado—or the possibly political motives of LULAC—may be attributed to Commissioner Rodriguez.  This is simply not so.  It is well settled that "the motive of an informant is not a relevant consideration .in determining [an agency's] good faith" in issuing a subpoena.  *United States v. Cortese,* 614 F.2d 914, 921 (3d Cir.1980).  Indeed, as the Third Circuit has remarked, "[t]he reality of prosecutorial experience, that most investigations originate on the basis of tips, suggestions, or importunings of third parties, including commercial competitors, need hardly be noted."  *Wheeling-Pittsburgh, supra,* 648 F.2d at 130.  The issue, rather, is whether Commissioner Rodriguez *himself* was proceeding in good faith.  *Cf. Kugler v. Helfant,* 421 U.S. 117, 126 n. 6, 95 S.Ct. 1524, 1531 n. 6, 44 L.Ed.2d 15 (1975) (prosecutor's good

applied precisely that standard: "Neches Butane has raised a substantial question [about] whether the Commissioner and the EEOC are abusing the Court's process."

The problem with the term "substantial question" is that it expresses only a conclusion and is too cryptic to reveal much about how a decision is reached.  In this case, for instance, the district court used the term but applied the lower standard of the Fifth Circuit tax cases to rule in favor of the Company.  This approach, as we have said in Subsection II.B.1, *supra,* would unjustifiably derail too many EEOC subpoena enforcement proceedings.

7. This affidavit came to us entirely under seal.  At the trial court level, records are sealed pursuant to Federal Rule of Civil Procedure 26(c), which provides for various kinds of protective orders.  The rule requires the moving party to show "good cause," and thus, as a leading commentator has remarked, "puts the burden on the party seeking relief to show some plainly adequate reason therefor."  8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2035, at 264–65 (1970).

Although the Company's justifications to the district court do not appear in the record, counsel for the Company explained his client's position to us at oral argument:

Quite clearly, the reason we wanted a protective order or that we wanted the affidavit seen *in camera* is because if we got to take the deposition of Commissioner Rodriguez,

[we would want] an opportunity to get candid testimony from him on the issues that are contained in the affidavit without allowing him time to prepare testimony to rebut those allegations.

This, we think, is tantamount to trial-by-ambush.  Since we have been unable to discover anything truly confidential in the affidavit, we are at a loss to understand why it should not be open.  A record may be sealed, of course, according to the trial court's discretion, but we think that this discretion should be used with care and exercised only where the justifications for doing so appear considerably stronger than those the Company has presented here.  We therefore discuss the affidavit in its entirety, and conceal only the identity of the affiant.

For the sake of completeness, we also note that the Commission's justification for sealing its part of the record seems equally unpersuasive:

The precedent that [disclosure] would set . . . would have devastating effects on the Commission and on the government agencies that conduct investigations regarding businesses, because, for one reason, it would hamper the investigatory process because government officials would be hesitant to give their candid opinions regarding the investigation.

While we certainly agree that the Commission's concerns are important and deserving of careful consideration, we cannot see how they are implicated by the actual materials submitted to us in this case.

faith in criminal case means a "reasonable expectation of obtaining a valid conviction"). The views of LULAC or the Albarados do not concern that question. Their statements therefore do nothing to assist the Company in carrying its second-stage burden.

The remaining portions of the affidavit give us no greater pause. The month after listening to the Albarados, the affiant apparently received a telephone call from someone who identified himself as Commissioner Rodriguez. According to the original copy of the affiant's telephone diary (which has been stapled to the affidavit), this call was made at 4:30 p.m. on August 3, 1978. The caller asked about the Albarado case, gave a lengthy explanation of what constituted discrimination under title VII, and solicited the affiant's views on whether Mr. Albarado had, in fact, been discriminated against. The call ended abruptly when the affiant stated that Mr. Albarado probably did not have a claim. Although this telephone call may have been unusual, we are not willing to go so far as to say that it provides sufficient justification for ordering pre-subpoena enforcement discovery. The issue in any subpoena enforcement proceeding is whether enforcement would abuse the court's process, see, e.g., Powell, supra, 379 U.S. at 57–58, 85 S.Ct. at 255, and minor irregularities—provided always that there is no question about the basic legitimacy of the agency's investigation—do not rise to the "abuse of process" level. Cf. Wheeling-Pittsburgh, supra, 648 F.2d at 127 (indicating that the basic inquiry is "whether the SEC is pursuing a claim it knows it cannot win"). A general ruling on when a minor irregularity becomes important enough to trigger a defendant's right to preenforcement discovery must, of course, await another time. All we hold today is that the testimony in this case about a simple telephone inquiry is not enough.[8]

Although a district court unquestionably has the authority to prevent litigants from abusing its process, that authority is chan-neled by section 710, and section 710 does not confer upon the district courts the authority, in routine cases, to transform what should be summary subpoena enforcement actions into lengthy and time-consuming discovery battles. The district court in this case was clearly too quick on the counter-discovery trigger. The order compelling discovery and a deposition from Commissioner Rodriguez as conditions precedent to subpoena enforcement transformed this section 710 proceeding into a long and drawn-out battle. Absent the substantial demonstration of abuse already described, a section 710 proceeding should be only a skirmish, quickly brought and just as quickly ended. The Company has not, on this record, made such a demonstration. It therefore follows that the district court's discovery and deposition order must be vacated, and that the accompanying sanction (the stay) must also be vacated.

## IV. CONCLUSION.

We conclude that the district court exceeded the confines of the discretion implicitly given it by section 710 of title VII. According to the approach described in this opinion, a district court has authority to grant a title VII defendant pre-subpoena enforcement discovery only in a truly exceptional case, that is, in a case where the defendant has made a preliminary and substantial demonstration of abuse. After carefully reviewing the history and purpose of the original section 710 of the Civil Rights Act of 1964, section 7 of the Equal Employment Opportunity Act of 1972 (enacting the current section 710), and section 11 of the National Labor Relations Act (incorporated by reference into title VII by section 710), we think that this deferential approach is the only one that remains faithful to the intent of the 1972 Congress that enacted the law. At the risk of seeming somewhat repetitive, we emphasize again that "[e]nforcement, to be effective, must be speedy," and that section 710 implicitly, if not expressly prohibits dilatory tactics

---

**8.** The affiant also claims to have received a preliminary call from Commissioner Rodriguez (setting up the principal call) and a call from a local, Houston-based Commission official.

during the early investigative stages of a discrimination suit. In this case, we do not think that an affidavit based partly on hearsay—and which presents evidence that is almost entirely irrelevant—provides sufficient justification for ordering extensive discovery and the deposition of one of the heads of the EEOC as conditions precedent to the enforcement of the agency's investigatory subpoena.

A writ of mandamus shall issue directing the district court to (1) vacate its order compelling discovery and requiring a deposition from Commissioner Rodriguez, (2) vacate its stay order entered as a sanction for noncompliance with the discovery and deposition order, and (3) proceed expeditiously to resolve the merits of the underlying section 710 action.

The writ is GRANTED.

E. GRADY JOLLY, Circuit Judge, dissenting:

I respectfully dissent because there is nothing in this case that requires the extreme remedy of mandamus. I dissent because the district judge did not abuse his discretion in refusing to allow the subpoena enforcement proceeding to progress further unless the EEOC remove the clouds of unlawful selective prosecution that hung over its case. I dissent because the facts in this case fit the standard for discovery in EEOC subpoena enforcement proceedings set out in the majority opinion and to which I generally subscribe.

Here, there is evidence that a charging party with whom the company is unwilling to settle boasts of his connections in Washington that will force the company to pay on a charge for which they think they have no liability. True to that boast, a commissioner of the Equal Employment Opportunity Commission, one of the five highest ranking officials in the entire administrative agency no less, makes a strange and suspicious telephone call inquiring of the merits of the unsettled charge. True to that boast, shortly after this astonishing telephone call, a commissioner's charge, attacking all of the employer's employment practices, is served upon the unwilling settler. These alleged and sworn facts constitute "meaningful evidence" that the employer was singled out for a massive investigation because it would not settle a charge on which it did not think it was liable. The only thing lacking was the "smoking gun." I therefore simply cannot agree that there was no "substantial demonstration" of abuse on "meaningful evidence,"[1] and that the district court abused its discretion so manifestly that mandamus is required. For these reasons I respectfully dissent from the granting of the writ.

---

1. *See* footnote 5, majority opinion: "We emphasize that 'a preliminary and substantial demonstration of abuse,' supported by 'meaningful evidence' does *not* mean actual proof."