**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Petitioner,**

v.

**BASHAS', INC., Respondent.**

**No. CIV 09–0209–PHX–RCB.**

United States District Court, D. Arizona.

Sept. 30, 2011.

See, also, 2011 WL 6098788.

Mary Joleen O'Neill, Nancy Eileen Griffiths, P. David Lopez, Sally Clifford Shanley, Equal Employment Opportunity Commission, Phoenix, AZ, for Petitioner.

Douglas David Janicik, Elizabeth Anne Schallop Call, Stephanie J. Quincy, Steptoe & Johnson LLP, Phoenix, AZ, for Respondent.

## ORDER

ROBERT C. BROOMFIELD, Senior District Judge.

Nearly five years ago, petitioner, the Equal Employment Opportunity Commission ("EEOC"), issued its first administrative subpoena to respondent, Bashas', Inc., attempting to obtain personnel data, including wage information pertaining to Bashas' employees. *See* Resp.'s exh. 114.[1] Since then the EEOC has served Bashas' with, *inter alia,* three more administrative subpoenas. Pet.'s exhs. 1, 3, and 10. These subpoenas are part of the EEOC's "ongoing investigation into whether Bashas' has engaged in discrimination against its Hispanic employees on the basis of national origin with respect to wages and promotions." *EEOC v. Bashas', Inc.,* 2009 WL 3241763, at *1 (D.Ariz. Sept. 30, 2009) (*"Bashas' II"*). On February 2, 2009, the EEOC filed an Order to Show Cause ("OSC") as to why this court should not enforce the fourth subpoena dated May 28, 2008. Thereafter, Bashas' filed a motion seeking leave to conduct limited discovery.

---

1. The cited exhibits herein were admitted into evidence during the evidentiary hearing on the EEOC's "Renewed Application for an Order to Show Cause Why An Administrative Subpoena Should Not Be Enforced" (Doc. 63), and reflect the exhibit numbers from that hearing.

Ultimately the court allowed Bashas' to conduct some limited discovery, and denied the EEOC's OSC without prejudice to renew. *Id.* at \*17. After completion of discovery, the EEOC filed the pending renewed application for an OSC (Doc. 63). During the course of the two and a half day hearing on that OSC, the court heard the testimony of 20 witnesses and admitted 45 exhibits into evidence. As the court allowed, the parties' simultaneously filed closing briefs in support of their respective positions. After careful review, the court makes the following findings of fact and conclusions of law.

## I. Governing Legal Standards

"[T]he test for enforcement" of an administrative subpoena "has been phrased in various ways[ ]" by the courts and the parties herein. *See Burlington Northern v. Office of Inspector General*, 983 F.2d 631, 637 (5th Cir.1993) (footnote omitted). From Bashas' perspective, the parties "agree" that *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), "governs the requirements for enforcement of this [EEOC] administrative subpoena." Resp.'s Brief (Doc. 103) at 3:7–8 (citing Tr. (Doc. 97) at 8:22–9:2). The cited portion of that transcript does show that at that point the EEOC stated that *Powell* set forth the parties' respective burdens of proof. The EEOC's position on the burden of proof issue has been anything but static, however.

During this litigation, the EEOC has invoked two different standards. Originally, the EEOC took the position that "[t]o successfully petition a court to enforce an administrative subpoena, [it] need[ ] only ... show that 1) the subpoena is within the agency's authority; 2) the demand is not too indefinite; and 3) the information sought is relevant to the investigation." OSC (Doc. 2) at 7:3–7 (citations omitted).

In renewing its OSC, the EEOC took that same position. *See* Renewed OSC (Doc. 64) at 7:25–8:1. These factors are derived from *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), wherein "[t]he Supreme Court set forth the standard for judicial enforcement of administrative subpoenas[.]" *FDIC v. Garner*, 126 F.3d 1138, 1142 (9th Cir.1997). After it satisfies those three *Morton Salt* factors, the EEOC contends that this subpoena must be "enforce[d] ... unless [Bashas'] can prove that [it] is unduly burdensome." *Id.* at 7:15–16 (citations omitted); *see also* Renewed OSC (Doc. 64) at 8:9–10 (citations omitted).

More recently, in its reply on this renewed OSC and subsequent arguments before the court, the EEOC shifted gears. Now, strictly relying upon *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), an Internal Revenue Services ("IRS") subpoena enforcement action, the EEOC states:

> [T]o meet its prerequisites for the enforcement of this subpoena, the EEOC need only prove[:]
>
> '[1] the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the [agency's] possession, and [4] that the administrative steps required by the [agency's statute or rules] have been followed.'

EEOC Reply (Doc. 76) at 2:16–22 (quoting *Powell*, 379 U.S. at 57–58, 85 S.Ct. 248) (emphasis added); *see also* Tr. (Doc. 79) at 9:17–20 (same); and Tr. (Doc. 97) at 9:4–17. Once the EEOC proves those four elements, it argues that the burden shifts to Bashas' to show an "abuse of the Court's process[.]" Tr. (Doc. 97) at 10:12–13; 11:5–6 (same). "Such an abuse would take place[,]" the EEOC posits, "if the summons had been issued for an improper

purpose." *Id.* at 10:8–9; *see also* Reply (Doc. 76) at 5:7 (citation omitted). The EEOC stresses that Bashas' burden in this regard "is a heavy one." *Id.* at 5:6 (internal quotation marks and citation omitted); Tr. (Doc. 97) at 10:16 (same).

Practically from the outset, Bashas' has repeatedly recited *Powell* as the governing legal framework, even though this is not an IRS subpoena enforcement action. Bashas' first took that position in its reply when moving to conduct limited discovery, Reply (Doc. 16) at 2:9–16 (*In re EEOC,* 709 F.2d 392, 400 (5th Cir.1983) (citing, in turn, *Powell,* 379 U.S. at 57–58, 85 S.Ct. 248))[2]; it has continued to adhere to that view since. *See, e.g.,* Resp. (Doc. 25) at 8:4–8 (same); Resp. (Doc. 72) at 9:24–26 (same). After the evidentiary hearing on the renewed OSC, Bashas' argued that because the EEOC cannot meet what it views as "even the most *basic* requirement for enforcement" of the May 28, 2008 subpoena under *Powell*—that it was issued for a "'legitimate purpose[ ]'"—the court must deny enforcement of that subpoena. *See* Resp.'s Brief (Doc. 103) at 1:14–15 (citing *Powell,* 379 U.S. at 57, 85 S.Ct. 248) (emphasis added).

■ The parties' reliance upon *Powell,* especially in this post-discovery context, is misplaced. Undoubtedly, the Ninth Circuit applies the *Powell* factors to IRS subpoenas. Most recently, in *United States v. Richey,* 632 F.3d 559 (9th Cir.2011), the Ninth Circuit reiterated that "[t]o obtain enforcement of [an IRS] summons, the

Government has the initial burden of establishing a prima facie showing that[ ]" the four *Powell* factors have been met. *Id.* at 564 (citing *Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248; *Ponsford v. United States,* 771 F.2d 1305, 1307 (9th Cir.1985)). Unlike some other Circuits however, *see, e.g., In re EEOC,* 709 F.2d 392 (5th Cir. 1983) (citing *EEOC v. K–Mart Corp.,* 694 F.2d 1055, 1066 (6th Cir.1982)) ("The EEOC, . . . , has the burden of establishing the four requirements articulated in *Powell.*"); *EEOC v. University of Pittsburgh,* 643 F.2d 983, 985 (3rd Cir.1981) (applying *Powell* criteria to EEOC subpoena), the Ninth Circuit does not employ the *Powell* factors in deciding whether to enforce EEOC or other non-IRS administrative subpoenas. Instead, the Ninth Circuit applies a composite of the *Powell* and *Morton Salt* factors.

■ Viewing "[t]he scope of the judicial inquiry in an EEOC or any other subpoena enforcement proceeding" as "quite narrow[,]" *EEOC v. Children's Hosp. Med. Ctr.,* 719 F.2d 1426, 1428 (9th Cir.1983) (en banc), *abrogated on other grounds by Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), *as recognized by Prudential Ins. Co. v. Lai,* 42 F.3d 1299, 1303 (9th Cir. 1994), the Ninth Circuit deems three "questions" to be "critical" to that inquiry. *See id.* (citations omitted). Those questions are:

(1) whether Congress has granted the authority to investigate; (2) whether

---

**2.** Bashas' cites to *EEOC v. Karuk Tribe Housing Auth.,* 260 F.3d 1071, 1076 (9th Cir. 2001), as being in "accord" with *Powell* and the Fifth Circuit's decision in *In re EEOC,* 709 F.2d at 400. *See* Resp. (25) at 8:9; and Resp. (Doc. 72) at 9:28 (same). The accord signal may be used to show that the law of one jurisdiction is in accord with the law of another. *The Bluebook: A Uniform System of Citation,* p. 54 (19th ed. 2010). Despite

Bashas' assertion to the contrary, the Ninth Circuit's decision in *Karuk Tribe* is not in "accord" with either the Supreme Court's decision in *Powell* or the Fifth Circuit's decision in *In re EEOC. Karuk Tribe* is not in accord with those latter two cases because, as more fully explained herein, unlike the Fifth and some other Circuits, the Ninth Circuit does not apply *Powell* to EEOC subpoena enforcement actions such as this.

procedural requirements have been followed; and (3) whether the evidence is relevant and material to the investigation.

*EEOC v. Federal Express Corp.*, 558 F.3d 842, 848 (9th Cir.2009) (citing *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir.2001)) (quoting, in turn, *Children's Hospital*, 719 F.2d at 1428). It is the agency's burden to establish those three factors. *Children's Hospital*, 719 F.2d at 1428 (citations omitted). Once it does, "the subpoena should be enforced *unless* the party being investigated proves the inquiry is unreasonable because it is overbroad or unduly burdensome." *Id.* (citations omitted) (emphasis added). "Put another way," the Ninth Circuit has explained that "courts *must* enforce administrative subpoenas *unless* 'the evidence sought by the subpoena [is] plainly incompetent or irrelevant' to 'any lawful purpose' of the agency.'" *Karuk Tribe*, 260 F.3d at 1076 (quoting *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 433 (9th Cir.1975)) (quoting in turn *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 63 S.Ct. 339, 87 L.Ed. 424 (1943)).

Nevertheless, early on in this litigation this court did look to the *Powell* factors in considering whether to allow Bashas' to conduct limited discovery. *See EEOC v. Bashas'*, 2009 WL 1783437, at *5 (D.Ariz. June 18, 2009) (*"Bashas' I"*).[3] That does not preclude this court from employing the analysis of *Children's Hospital* and its progeny at this juncture, however.

For several reasons, it is proper and, indeed, necessary for this court to analyze whether to enforce the EEOC subpoena herein based upon the *Children's Hospital* line of cases, rather than upon *Powell*.

Primarily that is because while the Ninth Circuit applies the *Powell* factors in IRS subpoena enforcement actions, it uniformly applies the *Children's Hospital* criteria to EEOC and other non-IRS administrative subpoenas. *See, e.g., Federal Express*, 558 F.3d at 848 (applying *Children's Hospital* factors to challenge an EEOC subpoena); *Karuk Tribe*, 260 F.3d at 1076 (same); *Garner*, 126 F.3d at 1142 (invoking *Children's Hospital*) as "[s]tandard for [e]nforcement of [Federal Deposit Insurance Corporation ("FDIC")] [s]ubpoena;" *Reich v. Montana Sulphur & Chem. Co.*, 32 F.3d 440, 442 (9th Cir.1994) (employing *Children's Hospital* as "test" for determining whether to enforce a subpoena issued by the Occupational Safety and Health Administration [ ("OSHA") ]; *EPA v. Alyeska Pipeline Serv. Co.*, 836 F.2d 443, 446 (9th Cir.1988)) ("In considering the [Environmental Protection Agency] subpoena ..., the district court correctly articulated and applied the Ninth Circuit standard of judicial scrutiny[ ]" from *Children's Hospital* ). Further, the court is unaware of any Ninth Circuit authority, and the parties have not directed it to any, invoking the *Powell* standards in an EEOC subpoena enforcement action such as this.

Additionally, the law of the case doctrine does not preclude this court from employing the *Children's Hospital* factors rather than the *Powell* factors at this juncture. Under that doctrine, "when a court decides upon a rule of law, that decision should continue to govern the *same issues* in subsequent stages in the same case[.]" *United States v. Park Place Assoc., Ltd.*, 563 F.3d 907, 918 (9th Cir.2009) (emphasis added). "For a prior ruling to become law of the case as to a particular issue, that

---

**3.** Although this court repeated the *Powell* factors in *Bashas' II*, 2009 WL 3241763, at *10, it did not apply them because the primary focus continued to be whether Bashas' had meet is burden of proof to warrant allowing it to conduct limited discovery. *See id.* at *10–*14.

issue must have been decided explicitly or by necessary implication in the previous disposition." *Park Place*, 563 F.3d at 925 (citations and quotation marks and alteration omitted). Likewise, the " 'law of the case' does *not* apply to issues or claims that were *not actually decided." Mortimer v. Baca*, 594 F.3d 714, 720 (9th Cir.2010) (emphasis added).

■ Previously the discrete issue before this court was whether to allow Bashas' to "[c]onduct [l]imited [d]iscovery on the issue of whether the [EEOC's May 28, 2008] [s]ubpoena constitutes an abuse of process[.]" *Bashas' I*, 2009 WL 1783437, at *1 (internal quotation marks and citation omitted). Plainly then, in *Bashas' I* this court was not confronted with, and did not have to address, the separate and distinct issue which this renewed OSC raises: whether, in deciding if an EEOC subpoena should be enforced, *Powell* or *Children's Hospital* provides the analytical framework. Given those differing issues, the law of the case doctrine is not implicated here.

Close examination of *Bashas' I* bolsters this conclusion. Patterning its analysis after *In re EEOC*, 709 F.2d 392 (5th Cir. 1983), upon which Bashas' and the EEOC heavily relied, this court engaged in a " 'two-step approach' " for deciding whether to allow Bashas' to conduct limited discovery prior to considering the enforcement issue. *Bashas' I*, 2009 WL 1783437, at *5. At the first step, this court looked to the "affidavit of Paul G. Manget, the Enforcement Manager of the Phoenix District Office of the EEOC, who is responsible for the investigation of charges of employment discrimination[,]" to determine whether the EEOC had satisfied the *Powell* factors. *See id.* at *5–*6. Despite reciting the *Powell* factors in its reply, Reply (Doc. 16) at 2:12–16 (citations omitted), neither Bashas' nor the EEOC addressed those fac-

tors in discussing whether the court should allow counter-discovery. Hence, "given that Bashas" did "not challeng[e] the sufficiency of that affidavit, and given that the EEOC's burden at th[at] point [wa]s not onerous," this court "found that the first step in the enforcement process [wa]s met[.]" *Id.* The court limited its finding, stressing that the EEOC had met its burden "at least for *present* purposes." *Id.* at *6 (emphasis added). That relatively perfunctory consideration of the *Powell* factors mirrored the parties' focus on the second step—whether Bashas' made "a 'substantial demonstration of abuse based upon meaningful evidence[ ]' " so as to warrant allowing it to conduct counter-discovery. *See* Mot. (Doc. 10) at 7:18–20 (quoting *EEOC*, 709 F.2d at 400); Resp. (Doc. 14) at 3:22–23 (same) (citing *EEOC*, 709 F.2d at 400). Thus *Bashas' I* is not an obstacle to this court now considering which standards to apply in an EEOC subpoena enforcement proceeding, as opposed to those which apply in deciding whether counter-discovery is warranted.

Moreover, in its post-hearing brief the EEOC explicitly recognized the possibility that the *Children's Hospital* line of cases govern here. *See* Pet.'s Brief (Doc. 102) at 2:4; 2:17–22 (describing the Ninth Circuit as having "refined" and "streamlined" *Powell* so that "the critical inquiry" is the *Children's Hospital* factors). Further, whether under *Powell* or the "Ninth Circuit approaches," the EEOC argues that it "has satisfied each of the prerequisites for enforcement" of the May 28, 2008 subpoena. *Id.* at 3:1–3 (citation omitted). Thus, the EEOC can hardly claim prejudice due to this court's finding that the *Children's Hospital* standards, and not the *Powell* standards, govern this subpoena enforcement action.

■ Given that the *Children's Hospital* framework encompasses the abuse of pro-

cess issue, there also is no prejudice to Bashas' in that regard. To illustrate, in *Reich,* 32 F.3d 440, after finding that OSHA had "satisfied the three prongs of the *Children's Hospital* test for enforcement[,]" the Ninth Circuit went on to consider respondent's argument that the OSHA subpoena "should have ... been quashed as an abuse of process because OSHA initiated the [s]ubpoena to harass and punish [the respondent]." *Id.* at 449 (citing *Powell,* 379 U.S. at 58, 85 S.Ct. 248); *see also Garner,* 126 F.3d at 1146 (after engaging in a *Children's Hospital* analysis, the Court considered appellants' argument that the FDIC issued the subpoenas to harass them). This approach is consistent with the Supreme Court's recognition on more than one occasion that when a court is asked to enforce an EEOC subpoena, " 'its responsibility ... more generally [is] to assess any contentions by the employer that the demand ... has been made for an illegitimate purpose.' " *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 583, 107 L.Ed.2d 571 (1990) (quoting *EEOC v. Shell Oil,* 466 U.S. 54, 104 S.Ct. 1621, 1632 n. 26, 80 L.Ed.2d 41 (1984)). Analysis of the enforcement issue herein in accordance with Children's Hospital and its progeny, means that despite Bashas' strenuous assertions to the contrary, the burden will not be on the EEOC to show legitimacy of purpose in the first instance. Placing that initial burden upon the EEOC would, in fact, be at odds with the Ninth Circuit case law discussed herein.

## II. EEOC's Burden

■ Having found that *Children's Hospital* provides the legal framework for analyzing whether to order enforcement of the EEOC's May 28, 2008 subpoena, the next issue is whether the EEOC has established each of the three "critical" factors necessary to warrant enforcement of that subpoena. *See Children's Hospital,* 719 F.2d at 1428 (citations omitted).

### A. Congressional Grant of Authority?

The first factor which the EEOC must show is that "Congress has granted [it] the authority to investigate." *See id.* (citations omitted). Bashas' has vehemently maintained that the EEOC is not properly exercising its statutory authority to issue administrative subpoenas; but, wisely, it has never suggested that Congress did not grant the EEOC such authority.

Undoubtedly Congress has granted the EEOC the authority to issue administrative subpoenas. *See EEOC v. Deer Valley Unified School Dist.,* 968 F.2d 904, 906 (9th Cir.1992) ("The investigatory subpoena power of the EEOC is based on specific statutory authority[.]") "The EEOC bears the '[p]rimary responsibility for enforcing Title VII.' " *Federal Express,* 558 F.3d at 849 (quoting *Shell Oil Co.,* 466 U.S. at 61–62, 104 S.Ct. 1621) (citing 42 U.S.C. § 2000e–5(a)). "The EEOC's enforcement responsibilities are triggered by the filing of a charge of discrimination." *Id.* (citation omitted). Such "[a] charge may be filed by an individual who alleges that he was discriminated against or[,]" as here, "by a Commissioner of the EEOC." *Id.* (citing 42 U.S.C. § 2000e–5(b); 29 C.F.R. §§ 1607.7(a), 1601.11 (2007)); *see* Pet.'s exh. 7. "Once that charge is filed, [t]he EEOC is then *required* to investigate the charge and determine whether there is reasonable cause to believe that it is true." *Id.* (internal quotation marks and citations omitted) (emphasis added by *Federal Express* Court). Thus, "Congress not only has authorized but requires the EEOC to investigate charges of discrimination." *Children's Hospital,* 719 F.2d at 1428 (citing 42 U.S.C. § 2000e–5(b)) (footnote omitted).

To carry out that mandatory duty, the EEOC has a " 'broad [statutory] right of access to relevant information[.]' " *Federal Express*, 558 F.3d at 849 (quoting *Univ. of Pa.*, 493 U.S. at 191, 110 S.Ct. 577). That right " 'entitle[s] the EEOC to inspect and copy 'any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by [Title VII] and is relevant to the charge under investigation.' '" *Id.* (quoting *Shell Oil Co.*, 466 U.S. at 63, 104 S.Ct. 1621 (quoting in turn 42 U.S.C. § 2000e–8(a))). "In acquiring such evidence, the EEOC may exercise all powers enjoyed by the NLRB under 29 U.S.C. § 161, *including* the *authority to issue administrative subpoenas and* to *request judicial enforcement* of those subpoenas." *Id.* (citing, *inter alia*, 42 U.S.C. § 2000e–9) (emphasis added). In short, as is readily apparent, "[i]t is clear that the EEOC has the power to investigate charges of discrimination and to utilize the statutory subpoena power in doing so." *Deer Valley Unified School Dist.*, 968 F.2d at 906 (citing, *inter alia*, *Children's Hospital*, 719 F.2d at 1428; 42 U.S.C. §§ 2000e–5(b); 2000e–8(a); 2000e–9).

### B. Procedural Requirements Followed?

In issuing the May 28, 2008 subpoena, the EEOC followed the procedural re-

quirements and Bashas' does not contend otherwise. *See* Tr. (Doc. 79) at 19. On its face, that indicates that it was issued pursuant to section 2000e–9. Pet.'s exh. 3 at 00001. Further, in accordance with 29 C.F.R. § 1601.16,[4] Paul Manjay, an EEOC Enforcement Manager, signed and issued that subpoena. *Id.* at 28:18–23; *see also* Pet.'s exh. 3 at 00001. As Rayford Irvin, currently the District Director for the EEOC's Phoenix office testified, Mr. Manjay has the authority to sign such subpoenas when the District Director is out of the office. *Id.* at 12:20–21; 28:9–15. That subpoena further complies with section 1601.16 in that it identifies *Chester V. Bailey*, the then District Director of EEOC's Phoenix office as the "issuing official," and includes his EEOC office address. *See* Pet.'s exh. 3 at 00001. As section 1601.16(a) also requires, the May 28, 2008 subpoena identifies the evidence subpoenaed, *id.* at 00002–00005; and it directs that such evidence be mailed to Charles Rahill, an EEOC Investigator, at his EEOC office address. *See id.* at 00001; *see also* Tr. (Doc. 97) at 60:20–61:11. That subpoena further comports with section 1601.16(a) in that it sets forth the place, date and time where the subpoenaed evidence is returnable. *See id.* Thus, as with the first *Children's Hospital* factor— a congressional grant of authority to inves-

---

4. Subsection (a) of that EEOC regulation reads in pertinent part as follows:

> To effectuate the purposes of title VII, . . . , any member of the Commission shall have the authority to sign and issue a subpoena requiring: . . .
>
> (2) The production of evidence including, but not limited to, books, records, correspondence, or documents, in the possession or under the control of the person subpoenaed; and
>
> (3) Access to evidence for the purposes of examination and the right to copy.
>
> Any District Director, and the Director of the Office of Field Programs, or upon dele-

gation, the Director of Field Management Programs, or any representatives designated by the Commission, may sign and issue a subpoena on behalf of the Commission. The subpoena shall state the name and address of its issuer, identify the person or evidence subpoenaed, the person to whom and the place, date, and the time at which it is returnable or the nature of the evidence to be examined or copied, and the date and time when access is requested. A subpoena shall be returnable to a duly authorized investigator or other representative of the Commission.

29 C.F.R. § 1601.16(a) (2010).

tigate—the EEOC has easily met the second factor thereunder; it followed the procedural requirements for issuance of the May 28, 2008 subpoena. Whether the EEOC can satisfy the third ‸ *Children's Hospital* factor—relevancy and materiality—requires more discussion though.

### C. "Relevant and Material"?

The EEOC's assertion that this court "has found that [it] has satisfied the relevancy requirements necessary for enforcement of an administrative subpoena[,]" strongly implies that based upon the law of the case doctrine, the relevancy prong has been met. *See* Pet.'s Brief (Doc. 102) at 3:27–28; n. 1 (citing Doc. 40 at 35). Hence, there is no need for the court to address relevancy now.

The EEOC is conveniently overlooking the context of the relevancy discussion in *Bashas' II*, however. Because Bashas' response to the original OSC "could be . . . construed[ ]" as "seek[ing] denial of enforcement" of the subject subpoena in that purportedly it sought " 'completely irrelevant' " information, this court was "compelled to *at least comment* upon that assertion." *Bashas' II*, 2009 WL 3241763, at *15 (quoting Resp. (Doc. 25) at 12 (emphasis omitted)). "Commenting" upon an issue amounts to nothing more than dicta having no preclusive effect; thus, the law of the case doctrine does not preclude this court from revisiting anew the relevancy issue on this renewed OSC, and following a full-blown evidentiary hearing. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1093 (9th Cir.1998) (internal quotation marks and citation omitted) ("A significant corollary to the [law of the case] doctrine is that dicta have no preclusive effect.")

Further, in concluding its relevancy discussion this court emphasized that "[a]gain, *at least for the moment*," it was "satisfied that the subpoenaed information, while perhaps 'not necessarily relevant in an evidentiary sense[,] . . . will help the EEOC craft additional information requests that may produce evidence of discriminatory treatment.' " *Id.* at *16 (quoting *Federal Express*, 558 F.3d at 854) (emphasis added). As is readily apparent, especially because the court carefully limited the scope of its earlier relevancy discussion, the law of the case doctrine is inapplicable now.

Title VII gives the EEOC considerable leeway in accessing evidence as part of its statutory duty to investigate employment discrimination. The EEOC is entitled to "any evidence of any person being investigated . . . that relates to unlawful employment practices covered by [Title VII] and is relevant to the charge under investigation." 42 U.S.C. § 2000e–8(a). Although this court is assessing relevancy anew, the *Federal Express* standards recited in *Bashas' II* continue to guide the relevancy inquiry herein:

> [C]ourts must enforce administrative subpoenas unless the evidence sought by the subpoena is plainly incompetent or irrelevant to any lawful purpose of the agency. . . . Relevancy in this context is determined in terms of the investigation rather than in terms of evidentiary relevance. . . . Moreover, the relevancy requirement is not especially constraining. . . . The term relevant is generously construed to afford[ ] the Commission access to virtually any material that might cast light on the allegations against the employer.

*Bashas' II*, 2009 WL 3241763, at *16 (internal quotation marks and citations omitted). The "might cast light" formulation encompasses "an indication of a realistic expectation rather than an idle hope that something may be discovered." *David H. Tedder & Associates, Inc. v. U.S.*, 77 F.3d

1166, 1169 (9th Cir.1996) (internal quotation marks and citation omitted); *see also EEOC v. Aaron Brothers, Inc.,* 620 F.Supp.2d 1102, 1105–1106 (C.D.Cal.2009) (citations omitted) (noting, when examining a nation-wide EEOC subpoena there "must be a realistic expectation that something may be discovered[ ]").

The May 28, 2008, subpoena requests that Bashas' "[p]rovide the electronic or computerized data listed in the [attached] appendix[.]" Pet.'s exh. 3 at 00002 at ¶ 1. That appendix lists six fairly broad categories of requested data, and numerous subtypes of information within each of those categories. From the "Employee Root Master File," for example, the EEOC is seeking the gender of each identified employee; details of the employee's union affiliation, as well as the employee's "layoff flag." *See id.* at 00003–00005.

The EEOC offers several generic reasons why the requested "[e]lectronic employee data, … is highly relevant to the investigation of the Commissioner's Charge alleging national origin discrimination in promotion and wages." Pet.'s Brief (Doc. 102) at 5:20–22. First, then Deputy Director Irvin testified that the EEOC needs the subpoenaed information to "further [its] investigation[.]" Tr. (Doc. 97) at 30:16. Second, in similarly vague terms, Mr. Irvin testified that acquisition of the actual computer data "would be the most efficient way to complete [the EEOC's] investigation." *Id.* at 80:12–13. Mr. Irvin did not elaborate on either point. When directly queried, Mr. Irvin did add that the EEOC would "probably [perform] regression analyses[ ]" on the subpoenaed data. *Id.* at 91:13–17. Third, rather than pointing to any record evidence or offering any explanation, quoting directly from *Federal Express,* 558 F.3d 842, the EEOC merely states that the requested "data will 'help [it] craft additional information requests

that may produce evidence of discriminatory treatment.'" Pet.'s Brief (Doc. 102) at 6:1–2 (quoting *Federal Express,* 558 F.3d at 854).

Bashas' concedes that the definition of relevancy is "broader in the context of an administrative subpoena" such as the EEOC subpoena at issue. *See* Resp.'s Brief (Doc. 103) at 19:9. Perhaps that is the reason why Bashas' is not contesting the relevancy of the bulk of the subpoenaed data. There are a few subsets of that data, however, which Bashas' asserts are irrelevant: "[t]he EEOC's request for gender, layoff and union eligibility information[.]" *Id.* at 19:13–14. Thus, "at a minimum[,]" Bashas' is seeking to have the subpoena "narrowed to … exclude th[ose] clearly irrelevant data requests[.]" *Id.* at 20:16 and 18.

Comparing the subpoenaed data to the Commissioner's Charge shows that with one exception Bashas' position is well-taken. In that Charge, Commissioner Silverman states her "belie[f]" that Bashas' has "violated Title VII by discriminating against Hispanics due to their national origin[ ]" by "failing to pay Hispanic employees comparable wages to non-Hispanic employees and failing to promote Hispanics into Management positions." *See* Pet.'s exh. 7. It is readily apparent how the data sought from Bashas' "Employee Payroll Master File," such as weeks worked by quarter, pay rates and annual wage base data, are directly relevant to that Charge. *See id.* at 00005; *see also Children's Hospital,* 719 F.2d at 1428 ("evidence sought … the charging parties' personnel files and job descriptions, and lists of other individuals subject to similar disciplinary action by the Hospital—is clearly relevant and material to the charges [of race discrimination] being investigated[ ]").

In sharp contrast, the court fails to see the relevancy of gender to the EEOC's

investigation of asserted national origin discrimination by Bashas'. Equally irrelevant is the EEOC's request for union affiliation, including details of an employee's union "code[,]" "id number[,]" and "8 digit union eligibility date[.]" *See* Pet.'s exh. 3 at 00004–00005. Contributing to this finding is the fact that the EEOC, which has the initial burden of proof as to relevancy, offers no explanation as to how gender or union affiliation is relevant to its investigation of national origin discrimination.

On the other hand, conceivably an employee's "layoff flag" could be relevant in investigating this charge of national origin discrimination. Hypothetically, it is possible to envision a situation where being "flagged" for layoff impacts an Hispanic employee's promotion or wage opportunities, or both. The converse is also possible. Again, hypothetically speaking, the "layoff flag" data could reveal that Hispanic and non-Hispanic employees have been "flagged" for layoff in the same numbers; at the same time; and at the same rate. Either way, this layoff data "might cast light" on the allegations that Bashas' has discriminated against Hispanics in both wages and promotions. *See Tedder & Associates,* 77 F.3d at 1169 (internal quotation marks and citation omitted). In sum, although the parameters of relevancy are broad in the context of EEOC subpoenas, they are not boundless. Consequently, while nearly all of the subpoenaed data falls within the expansive definition of relevancy here, a few subsets of data do not. Assuming for the moment that the court ultimately grants enforcement of the May 28, 2008 EEOC subpoena, that subpoena must be modified so as to remove any requests for Bashas' employee data relating to gender and union affiliation details of any type. In all other respects, the EEOC has met its burden of showing the relevancy of the subpoenaed data.

### III. Bashas' Burden

Except for the few requests which the court deems irrelevant, in all other respects, the EEOC has met its initial burden of establishing each prong of the *Children's Hospital* test. To recap, the EEOC has shown that: (1) it has the Congressional authority to investigate national origin discrimination in employment; (2) it followed the procedural requirements for issuing the challenged subpoena; and (3) the evidence, with a few narrow exceptions, is relevant and material to its investigation of Bashas'. *See Children's Hospital,* 719 F.2d at 1428. Of course, that does not end the inquiry. *See Reich,* 32 F.3d at 448. Particularly here, where Bashas' has so vigorously challenged this subpoena and the EEOC's entire investigation, in many respects the inquiry now is just beginning.

The court still must consider whether the subpoena violates Bashas' Fourth Amendment rights because that Amendment "offers additional protection to commercial privacy interests." *Id.* (citing *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 2642–43, 96 L.Ed.2d 601 (1987)). However, "in the context of an administrative search, the Fourth Amendment's restrictions are limited[.]" *Id.* " 'The gist of th[at] protection is in the requirement . . . that the disclosure sought shall not be unreasonable.' " *Id.* (quoting *Morton Salt,* 338 U.S. at 652–53, 70 S.Ct. 357) (other citations omitted). "Thus [the May 28, 2008] subpoena will not be enforced if [Bashas'] proves it is overbroad *or* unduly burdensome." *Id.* (citation omitted) (emphasis added); *see also Garner,* 126 F.3d at 1145 (citations and internal quotation marks omitted) ("[O]nce an agency establishes that is has properly issued a subpoena, it should be enforced unless the party being investigated proves the inquiry is unreasonable because it is

overbroad or unduly burdensome.") Bashas' burden is a "difficult" one. *See Aaron Brothers,* 620 F.Supp.2d at 1106 (citing *E.E.O.C. v. Maryland Cup Corp.,* 785 F.2d 471, 477 (4th Cir.1986) ("[T]he burden of proving that an administrative subpoena is unduly burdensome is not easily met."); *E.E.O.C. v. United Air Lines, Inc.,* 287 F.3d 643, 653 (7th Cir.2002) ("[T]he employer 'carries the difficult burden of showing that the demands are unduly burdensome or unreasonably broad.'")). The court will separately examine whether Bashas' can meet its burden of proving either that the subpoena is overbroad or that compliance would be unduly burdensome.

### A. Overbroad?

■ The subpoena, which is dated May 28, 2008, pet.'s exh. 3 at 00001, requests data "for the period May 2, 2004 to *present date." Id.* at 00002, ¶ 1 (emphasis added). Thus, the EEOC is seeking data for slightly more than four years. *See* Renewed OSC (Doc. 64) at 4:24–26 ("This subpoena requested . . . basic employee information . . . from May 1, 2004 through the date of the subpoena[.]"). Bashas' overbreadth argument is solely temporal. It baldly asserts that the subpoena is overbroad because that roughly four year time span is too "expansive[.]" Resp.'s Brief (Doc. 103) at 18:23. Pointing out that the Commissioner's Charge was filed in May, 2007,[5] "[o]ther than to dovetail with the last date similar information was provided in the *Parra* litigation [6]," Bashas' claims "there is no apparent reason on the face of the [C]harge that supports the expansive dates of th[at] request[.]" Resp.'s Brief (Doc. 103) at 18:21–23. Bashas' further takes the EEOC to task for failing to "provide[ ] any basis for such a broad request—other

than to admit that it was conducting a general 'compliance review' of Bashas' as opposed to an investigation of any specific concerns." *Id.* at 18:24–27 (quoting Tr. (Doc. 97) at 121:23) (footnote added). If this court holds that the subpoena is enforceable, Bashas' requests that the court "narrow" its scope by, among other things, excluding requests for "data dating in excess of one year prior to the charge." *Id.* at 23:7 and 9.

Bashas' is impermissibly placing the burden on the EEOC, however. It is Bashas' burden, not the EEOC's, to prove that the subpoena is overbroad. Mr. Rahill's isolated comment regarding "compliance review"—the only evidentiary basis for Bashas' temporal overbreadth argument—does not adequately show that the subpoena is overbroad in terms of its time frame. When asked on cross-examination whether Bashas' "concern" was about having "no way to defend itself against such an amorphous charge[,]" Mr. Rahill responded:

> We looked at this as . . . a compliance review. And I wanted the information to verify if [a] violation in fact took place. If it did not take place[,] that would be the end of the investigation.

Tr. (Doc. 97) at 121:21–122:1. Bashas' attempt to equate Mr. Rahill's "compliance review" observation to an impermissible "fishing expedition," is unavailing. *See Garner,* 126 F.3d at 1146 (citation and internal quotation marks omitted) ("An administrative subpoena . . . may not be so broad so as to be in the nature of a 'fishing expedition.'")

There is nothing about the quoted testimony standing alone, upon which Bashas' so heavily relies, to support the view that the EEOC is engaging in a impermissible

---

5. *See* Pet.'s exh. 7 at 00001.

6. *Parra* refers to the private class action of *Parra v. Bashas', Inc.,* No. CIV 02–0591–PHX–RCB, familiarity with which is assumed.

"fishing expedition" here. Moreover, when he characterized the EEOC's investigation as a "compliance review," Mr. Rahill was not being questioned about the subpoena's time frame. Nor, for that matter, was he asked what he meant by the phrase "compliance review." Thus, Bashas' has not met its difficult burden of proving overbreadth.

Lastly, Bashas' offers no justification, evidentiary or otherwise, for limiting the time frame of the subpoenaed data to one year prior to the date of the Charge, *i.e.*, May 9, 2006, as opposed to the roughly four years indicated in the subpoena.

Although the court has found that the subpoena's time frame is not overbroad, as will soon become apparent, it does not necessarily follow that Bashas' must provide employee data for the entire four year period which the subpoena covers.

### B. Unduly Burdensome?

Bashas' argues that compliance with the May 28, 2008, subpoena would be unduly burdensome because it would be costly and labor intensive. Bashas' points to several factors to support this argument. First, it does not keep its employee data in any of the three electronic formats, "Excel, Access or ASCII delimited ("csv"), which the subpoena specifies." *See* Pet.'s exh. 3 at 00002. Therefore, Bashas' would have to convert nearly all of the requested data from its "Infinium HR [Human Resources] database." Tr. (Doc. 98) at 132:18. Second, Bashas' has concerns about the accuracy of that Infinium database because some of the requested fields are incomplete or inaccurate. To assure accuracy and validity, Bashas' posits that it would have to undertake a "hand review of thousands of personnel files to respond accurately." Resp.'s Brief (Doc. 103) at 20:24–25. According to Bashas', such a review "would require significant staffing" at a cost of "approximately $200,000." *See id.* at 22:9–10 (citation omitted). Third, Bashas' asserts that this burden could be "alleviat[ed]" by the EEOC conducting its own "review of [Bashas'] hard personnel folders[.]" *Id.* at 22:17–18.

Disregarding the cost aspect of compliance, the EEOC asserts that compliance can *"only* be excused" upon one condition; that is, "if it 'threatens to unduly disrupt or seriously hinder normal operations of a business.'" Pet.'s Brief (Doc. 102) at 23:10–13 (quoting *Maryland Cup Corp.*, 785 F.2d at 479) (emphasis added). The EEOC did not frame its argument in terms of that standard though. Rather, it attacks the competency of Don Adams, Bashas' Director of Human Resources Development and Native American Affairs ("HR Director"). The EEOC maintains that Adams is not competent to testify as to "[t]he content and capabilities of [Bashas'] computerized data collection system[.]" Pet.'s Brief (Doc. 102) at 23:15–16. Additionally, the EEOC contends that compliance is not unduly burdensome because Bashas' has "admitted ... that it ... ha[s] at least a significant amount of the data requested and could produce it." *Id.* at 24:13–14 (emphasis omitted). The EEOC thus concludes that Bashas' "cries" of undue burden "fall far short of the standard required to avoid compliance with this subpoena." *Id.* at 25:9–10.

 The Ninth Circuit has yet to consider what constitutes "unduly burdensome" in an EEOC subpoena enforcement action such as this. Two district courts within this Circuit have, though. Each has adopted the Fourth Circuit's formulation in *Maryland Cup*, 785 F.2d 471. The Court there found that "[c]ompliance with a subpoena is excused if it 'threatens to unduly disrupt or seriously hinder normal operations of a business.'" *Aaron Bros.*, 620 F.Supp.2d at 1106 (quoting *Maryland*

*Cup,* 785 F.2d at 479); *EEOC v. McCormick & Schmick's,* 2007 WL 1430004, at *7 (N.D.Cal.2007) (same). "Alternatively, if the cost of gathering the information would be 'unduly burdensome in the light of the company's normal operating costs, the subpoena should not be enforced.'" *Id.* (quoting *Maryland Cup,* 785 F.2d at 479); *McCormick & Schmick's,* 2007 WL 1430004, at *7 (same). It is not necessary to measure the cost of compliance strictly based upon a company's normal operating costs, though. As the Seventh Circuit has soundly reasoned, "[i]f the personnel or financial burden on the employer is great compared to the resources the employer has at its disposal, the district court should attempt to alleviate this burden." *EEOC v. United Air Lines, Inc.,* 287 F.3d 643, 654 (7th Cir.2002) (citation omitted).

This court, too, will be guided by those standards in resolving the issue of whether it would be unduly burdensome for Bashas' to comply with the May 28, 2008, EEOC subpoena. At the same time, however, the court recognizes and endorses the view that "[w]hat is unduly burdensome depends on the particular facts of each case and no hard and fast rule can be applied to resolve the question." *See id.* at 653 (internal quotation marks and citation omitted). Thus, while there is some flexibility in determining what constitutes an undue burden, there is none in terms of Bashas' burden of proof as the respondent. Bashas' has a "difficult" burden to meet. *See Aaron Bros.,* 620 F.Supp.2d at 1106 (citations omitted).

■ In the present case, the EEOC asserts that "[c]ompliance with [its] administrative subpoena should *only* be excused" if that first prong—disruption of business—is met. Pet.'s Brief (Doc. 102) at 23:10–13 (quoting *Maryland Cup Corp.,* 785 F.2d at 479) (emphasis added). Disruption of business is not the only way to

establish that it would be unduly burdensome to comply with an agency subpoena, as is evident from *Maryland Cup.* Moreover, it is cost, not disruption of its business, which is the crux of Bashas' undue burden argument. Thus, because Bashas' bears the burden of proving an undue burden, this court will concentrate, as did Bashas', on the cost aspect of compliance.

Preliminarily though, the court rejects Bashas' suggestion that the subpoena is unduly burdensome because it must be provided in one of three formats—"Excel, Access, or ASCII[.]" Resp.'s Brief (Doc. 103) at 20:23. That is an inaccurate characterization of the subpoena. The subpoena states that the data, *"may* be written" in one of those three formats. Pet.'s exh. 3 at 00002, ¶ 1 (emphasis added). Indicating some leeway on the format issue, the subpoena further states that "[o]ther formats may be acceptable if approved by the EEOC prior to submission." *Id.* The EEOC repeated that option in a February 21, 2008, letter to Bashas' counsel. *See* Pet.'s exh. 13, at 00001. The court thus finds that Bashas' has not proven that compliance would be unduly burdensome based solely upon the format in which the subpoenaed data should be provided.

The bulk of Bashas' undue burden argument—the overall cost of compliance—carries far more weight. Bashas' makes that argument relying solely upon the testimony of Don Adams, Bashas' HR Director. The EEOC argues that "Mr. Adams is not competent to address the computer system[,]" however. Pet.'s Brief (Doc. 102) at 24:8–9. Hence, Bashas' has failed to produce any "evidence that complying with the subpoena would be unduly burdensome." *Id.* at 22:17–18.

To show Mr. Adams' supposed lack of competency, the EEOC points out that when asked about his background in information technology ("IT"), Mr. Adams' re-

sponded, "Solely as a user[.]" Tr. (Doc. 98) at 158:21. Further, the EEOC notes that Mr. Adams has not had any training or formal education in IT.[7] *Id.* at 158:22–159:1. Grasping at straws, the EEOC challenges Mr. Adams' competency because he does not know the number of employees in Bashas' IT Department. *See id.* at 158:16–17. The EEOC thus faults Bashas' for not "produc[ing] anyone who actually works in its [IT] Department"—someone it describes "who could actually testify about the contents or technical capabilities of its electronic database." Pet.'s Brief (Doc. 102) at 23:18–22.

Federal Rule of Evidence 601 presumes witness competency, stating in relevant part that "[e]very person is competent to be a witness except as otherwise provided in these rules." Fed.R.Evid. 601. That Rule must be read in conjunction with Rule 602, however, providing that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602. Relatedly, Rule 701, limits opinions of lay witnesses, such as Mr. Adams, to, *inter alia,* "opinions rationally based on the perceptions of the witness[.]" Fed.R.Evid. 701.

As the following review of Mr. Adams' testimony makes abundantly clear, he is competent to testify about the contents and capabilities of the Infinium database as they relate to providing the subpoenaed information. It is equally clear that he has personal knowledge of the matters upon which he is testifying. Likewise, clearly Mr. Adams' opinions are "rationally based" upon his "perceptions" gained by working with that database over the years. The EEOC's argument to the contrary, *i.e.,* Mr. Adams' is not competent to testify about the foregoing matters, thus is wholly unavailing and borders on the frivolous.

Despite not working in Bashas' IT Department, Mr. Adams' demonstrated a strong working familiarity with the "Infinium HR payroll database[,]" where the subpoenaed information is available. *See* Tr. (Doc. 98) at 132:13–18. "Since 1990[,]" Bashas' has been using that database to "input [employee] data[.]" *See id.* at 132:18–21. As "the project manager for human resources projects[,] … particular[ly] … projects … hav[ing] to deal with IT," and "[a]s a project manager who's working on efforts to improve HR processes, programs, [and] consistency[,]" Mr. Adams gained personal knowledge of both the contents and limitations of the Infinium database. *See id.* at 126:1–3; 133:3–4.

Based upon his understanding and familiarity with the Infinium database, Mr. Adams testified that some of the requested data fields were "incomplete[.]" *Id.* at 133:14–20. For example, in 2002, when Bashas' began a tuition reimbursement program, Mr. Adams searched the Infinium database "to determine who within [Bashas'] had education levels above high school level." *Id.* at 134:1–2. Education levels were "very intermittent" to the point of there being "almost no data whatsoever[ ]" for that field. *Id.* at 134:3–4. Education levels would, instead, be found in Bashas' hard copy personnel folders. *Id.*

**7.** The EEOC states that Mr. Adams "has no training *whatsoever* in IT, either formal or *informal.*" Pet.'s Brief (Doc. 102) at 22:25–26 (citing Tr. (Doc. 98) at 158:13–159:2) (emphasis added). That is inaccurate. Mr. Adams was not questioned in the cited excerpt, or elsewhere, regarding any informal IT training. What is more, given Mr. Adams' testimony described above, that he has undertaken various IT related projects in his capacity as Basha's HR Director, certainly he has "informal" training of the type which can be gained through hands-on-experience.

at 134:6–8. Similarly, Mr. Adams testified that in the Infinium database, information regarding "performance rating[ ] . . . is extremely incomplete, not used." *Id.* at 134:15–16.

Not only are certain fields in the Infinium database inaccurate or incomplete, but Mr. Adams opined that that database has "problems with validity[.]" *Id.* at 134:17–18. Those problems were revealed to Mr. Adams in 2002 while he was "creat[ing] a training database for Bashas'[ ]" to insure that it was "keep[ing] a record of [its] training[,]" and meeting any "mandatory [training] requirements." *Id.* at 134:17–135:1. After "design[ing] a catalog of classes and curriculums" to support its "training efforts," in the fall of 2002, the Infinium database "software wouldn't allow [them] to interface with it." *Id.* at 135:2–9. The inability to interface was due to the fact that at that time, the Infinium system listed "22,000 retail positions[.]" *Id.* at 135:7–8. Now, after rewriting its job descriptions, Bashas' has "perhaps 52 to 80 positions . . . nowhere close to 22,000." *Id.* at 135:16–18. Mr. Adams "assum[ed]" that to match those 22,000 position codes with the far less number of current job titles would entail "construct[ing] a duplicate database[.]" *Id.* at 137:12–13. In light of the foregoing, when asked whether "position and job codes . . . would be accurately in the system in electronic format[,]" Mr. Adams candidly responded that he could not "tell . . . that the job code would be correct since initially it was used incorrectly." *Id.* at 140:18–141:1.

Similarly problematic is the inaccuracy of the pay rates in the Infinium system, as testified to by Mr. Adams. He is "not certain" that the "pay rate" in the Infinium system "would be correct." *Id.* at 141:6–7. Mr. Adams "doubt[ed]" that the "validity" of the pay rates "would be 100 percent[ ]" prior to 2005, because then Bashas' had a "proliferation of position codes and perhaps six, seven different individuals keypunching in those rates[.]" *Id.* at 141:12–15. The situation changed in 2006. "[B]y the end of [that year][,]" Bashas' "had implemented [its] electronic hiring management system," which, among other things, "force[d] consistency" in hiring. *Id.* at 144:1–3. Although there are inaccuracies in the Infinium database regarding job codes, job titles, and pay rates, Mr. Adams agreed that such information "would be accurately listed in the hard copy files of [Bashas'] employees[.]" *Id.* at 142:17–20.

Another field for which the subpoena seeks electronic data is "ethnic id [identification][.]" *See* Pet.'s exh. 3 at 00003 (emphasis omitted). Mr. Adams became aware of "some problems" with that field while working on a project to "bring in tax credits for [Bashas'] Native American stores." Tr. (Doc. 98) at 138:25–139:2. He found that if a Bashas' employee did not "self-identify" their ethnicity, the Infinium system "automatically default[ed] . . . to Caucasian[ ]" for the ethnic identification field. *Id.* at 140:1–2. For "quite a period of time[,]" including during 2005, that default to Caucasian was the practice at Bashas', although it is not "currently[.]" *Id.* at 140:3–7. In sum, Mr. Adams' specifically identified six fields in Bashas' electronic employee data base which are inaccurate: (1) ethnic identification; (2) position code; (3) education; (4) performance rating; (5) job codes; and (6) pay rate.

After eliciting testimony from Mr. Adams on these inaccuracies or incomplete fields in the Infinium system, he was generally asked about his "concerns" for "the accuracy of the electronic data[ ] . . . from 2004 . . . to 2010[.]" *Id.* at 143:21–23. Noting that Bashas' has "been making real attempts to incrementally do a better job" with respect to the accuracy of its elec-

tronic employee data, Mr. Adams nevertheless expressed "grave concerns for 2004 and 2005." *Id.* at 143:25–144:1.

Mr. Adams did not express those same "grave concerns" for 2006, however, because, as mentioned earlier, "by the end of" that year Bashas' "had implemented" an electronic "hiring management system[.]" *Id.* at 144:1–2. That system "in a lot of ways ... force[d] consistency with how [Bashas'] hired, and also insured that proper on-boarding forms were being completed and [that] [Bashas'] had a gatekeeper in place[,]" Mr. Adams opined. *Id.* at 144:2–5. "By 2008," Mr. Adams pointed out that Bashas' "had installed a centralized timekeeping software[,]" which "integrate[s] with [its] Infinium database." *Id.* at 144:6–9.

"So by 2008[,]" with "the applicant tracking [system][,] the hiring management system[,]" which "connect[s] or passes data right into [Bashas'] database[,]" and the timekeeping software "that's [also] connected directly to the [Infinium] database[,]" Mr. Adams was "fairly certain that the [2008 electronic] data is pretty darn good data." *Id.* at 144:5–14. Besides vouching for the accuracy of Bashas' 2008 employee electronic data, Mr. Adams specified several other fields of electronic data which Bashas' could produce with accuracy, regardless of year. Those are an employee's: (1) number; (2) last name; (3) previous name; (4) date of birth; and (5) location code. *See id.* at 138:9–14; 138:20–22; 140:14–17. Additionally, Mr. Gregory Tucek, Bashas' in-house counsel, testified that its electronic field data includes date of hire and seniority date. *See* Tr. (Doc. 41) at 89:21–24.

Bashas' retains its employee information in two formats-hard copy and scanned documents, accessed through a personal computer, which can also be printed. *See id.* at 131:2; and 131:9–13. Using " 'Content

Manager' software, Bashas' has scanned its hard copy personnel folders for 2002, 2003 and 2007," and is "in the process of scanning [the] 2008" hard copy personnel files into that software. *Id.* at 131:2–5. Mr. Adams acknowledged that in the process of scanning Bashas' personnel folders, the years 2004 through 2005 were skipped. *See id.* at 153:4–15.

Particularly because the subpoena seeks information for the year 2004–2005, *inter alia,* initially the court found it curious that those folders were not scanned in chronological order. Mr. Adams convincingly explained, however, that because he only recently "started overseeing the HR records department[,]" he "do[es] not know the reason behind what years were scanned." *Id.* at 153:16–18. In the complete absence of any proof that the documents were scanned in an order so as to thwart the EEOC subpoena, the court declines to attribute an ulterior motive to Bashas' in that regard.

In any event, although some of Bashas' employee information has been scanned, and thus is electronically stored, consistent with his testimony detailed above, Mr. Adams' opined that if Bashas' were to respond to the subpoena, "[t]he best source of information would be in [its] personnel folders[,]" as opposed to in an electronic format as the subpoena demands. *Id.* at 130:17–18; *see also id.* at 152:22–153:3. Further, compliance with the subpoena's request for information in an electronic format would involve "a very manual process[ ] ... [t]o insure the validity of the data[.]" *Id.* at 145:6–14.

After being "asked to determine ... how much time and effort it would take to insure that the data that [Bashas'] had in [its] database was valid[,]" Mr. Adams met with the HR supervisor and Bashas' "top HR records clerk." *Id.* at 145:21–25. During that discussion, they concluded

that it would take an "average" of "23 minutes" to do "a rigorous job" of reviewing the electronic database "to insure" that its contents "actually matched what was in the [hard copy] personnel jacket." *Id.* at 146:3–4; 147:4–7. Using that 23 minute average review time, Mr. Adams next looked at the number of Bashas' employees for the years 2004 through 2007, and multiplied that number by the 23 minute average. *See id.* at 147:13–14. Then, based upon a $13.85 average hourly cost of a Bashas' HR records employee, Mr. Adams opined that it would take "about $100,000 worth of time" to conduct this manual review. *Id.* at 147:17.

The EEOC does not, in its closing brief, in any way contest Mr. Adams' calculations or methodology. But, on cross-examination, the EEOC did challenge one aspect of Mr. Adams' computations. When asked, "What was the cost per hour in 2008[,]" Adams acknowledged that he did not know. *See id.* at 156:6–7. That simple admission, especially without any context whatsoever, is not a sufficient basis for disregarding Mr. Adams' calculations as to the cost of compliance.

Shifting to Bashas' ability to pay for the review of employee information, whether in scanned or hard copy, Mr. Adams was asked whether "Bashas' has right now, $200,000 to fund that type of project[.]" *Id.* at 149:7–8. It is the answer, not the question which is evidence, however. *See* Ninth Circuit Manual of Model Jury Instructions–Civil, 1.7(2) ("Questions ... by lawyers are not evidence.") Therefore, because Mr. Adams himself did not testify to that $200,000.00 amount, the court is disregarding that particular dollar amount.

Moreover, as mentioned earlier, Mr. Adams opined the "total" it would take for a review of either hard copies or scanned personnel files for the years 2004–2007, would be "about $100,000 worth of time spent." Tr. (Doc. 98) at 147: 147. That $100,000.00 amount correlates to the average review time based upon the number of employees, years of review, and cost per hour for review, as testified to by Mr. Adams, whereas $200,000.00 does not.

Regardless, there is no basis for discounting Mr. Adams' testimony as to Bashas' current financial state. In fact, the EEOC does not dispute Mr. Adams' testimony on this point. Bashas' bankruptcy reorganization plan "has been approved and [it] [is] operating [under] that plan[.]" Tr. (Doc. 98) at 128:9–10. Mr. Adams' described Bashas' as being "staffed very leanly." *Id.* at 128:16. Further, he denied that Bashas' has any "free cash for discretionary spending[.]" *See id.* at 129:4–6. Bashas' "owe[s] creditors literally hundreds of millions of dollars[,]" and both its office support and retail level staffs are "stretched to the max[.]" *Id.* at 149:18–21. Thus, Bashas' has "tremendous constraints upon [it] as far as money [it] ha[s] to spend." *Id.* at 149:12–13. Given Bashas' financial situation, as Mr. Adams recounts it, Bashas' does not have the funds to comply with the subpoena by providing the EEOC with all of the requested data in electronic format. *See id.* at 149:18. When asked where Bashas' would find the money to perform the review process he described, Mr. Adams answered that he "honestly" did not know. *Id.* at 150:7. Bashas' has "established budgets and ... they're to a bare minimum." *Id.* at 150:8–9.[8]

---

**8.** Given Mr. Adams' candid and convincing description of Basha's relatively dire financial situation, such that it is now operating pursuant to a bankruptcy reorganization plan, the court is willing to overlook the lack of direct proof as to Bashas' normal operating costs. This approach is in keeping with this court's earlier expressed view that "no hard and fast

The EEOC's characterization of this proof notwithstanding, Bashas' has done more than simply "cry" that full compliance with the EEOC's May 28, 2008, subpoena would be unduly burdensome. *See* Pet.'s Brief (Doc. 102) at 25:9. Through the testimony of its HR Director, Mr. Adams, Bashas' has shown that the personnel and financial burden of full compliance would be "great compared to the resources [Bashas'] has at its disposal[.]" *See United Air Lines*, 287 F.3d at 654 (citation omitted). This proof by Bashas' is unrefuted in every significant aspect, as the foregoing discussion demonstrates.

*EEOC v. Randstad*, 765 F.Supp.2d 734 (D.Md.2011), lends further support to this court's view that it would be unduly burdensome for Bashas' to fully comply with the May 28, 2008, subpoena in its current form. Much like the present case, to respond to the EEOC's subpoena in *Randstad*, the employer claimed that it would have "to produce information as to over 100,000 job placements[;]" and that "to collect th[at] information, it would have to create records that do not exist as it does not maintain a specific database of job descriptions, job orders or essential job functions of temporary assignments." *Id.* at 742 (citations omitted). Based upon the employer's "estimate[ ] that compiling" the subpoenaed "information would take at least 120 hours of time and cost between $14,000 and $19,000[,]" the *Randstad* Court held that certain of the EEOC's subpoena requests were "unduly burdensome." *Id.* If compliance with the EEOC subpoena in *Randstad* was unduly burdensome, certainly compliance here would be unduly burdensome where the cost, from both a monetary and personnel standpoint, would be far greater than in *Randstad*.

The only two cases to which the EEOC cites, *E.E.O.C. v. Citicorp Diners Club, Inc.*, 985 F.2d 1036 (10th Cir.1993); and *E.E.O.C. v. Bay Shipbuilding Corp.*, 668 F.2d 304 (7th Cir.1981), in its attempt to show that Bashas' has not met its burden of proof on the issue of undue burden are readily distinguishable. At every step of the enforcement proceeding, in *Bay Shipbuilding*, 668 F.2d 304, there was a complete absence of proof by the respondent employer as to how compliance with the EEOC's subpoena therein might be unduly burdensome. *See id.* at 313. In sharp contrast to *Bay Shipbuilding*, where, among other deficiencies, the employer did not "present any affidavits to support its conclusionary assertion" that compliance with that EEOC subpoena would be unduly burdensome, *id.*, Bashas' has offered ample concrete proof to that effect.

Likewise, in contrast to *Citicorp Diners Club*, 985 F.2d 1036, whether the employer's evidence of undue compliance was deficient because, *inter alia*, it did "not offer[ ] any specific estimate of [the] cost involved[ ]" in compliance, *id.* at 1040, Bashas' did offer such proof through Mr. Adams' testimony earlier discussed. Also in contrast to *Citicorp Diners Club*, here, Bashas' has done more than show that compliance would be merely "inconvenient and involve some expense." *See id.* Simply put, neither of these cases alter this court's opinion that under the unique facts herein, it would be unduly burdensome for Bashas' to fully comply with the subpoena in its current form.

Before deciding how and to what extent it may modify or narrow the May 28, 2008, subpoena, the court must resolve the core issue of whether Bashas' has shown abuse of process by the EEOC. After all, if Bashas' prevails on that argument, Bashas' is

rule can be applied to resolve the question[ ]" of whether compliance is unduly burdensome.

*See United Air Lines*, 287 F.3d at 653 (internal quotation marks and citation omitted).

seeking to have this court deny enforcement altogether of that subpoena. Under that scenario, there would be no need to delve into the modification issue. So, for the moment the court will hold in abeyance the issue of possible modification and turn, instead, to the abuse of process issue.

### C. Abuse of Process

Enforcement of the EEOC's May 28, 2008, subpoena "would be an abuse of process[;]" hence this court should deny enforcement of that subpoena in its entirety, Bashas' argues. *See* Resp.'s Brief (Doc. 103) at 4:11. This argument has two closely related facets. Bashas' argues that the court should not enforce this subpoena because the EEOC undertook this investigation in bad faith and with an improper motive, *i.e.*, "to bolster the struggling *Parra* litigation." [9] *Id.* at 6:11. Enforcement thus would constitute an abuse of this court's process. *See id.* at 17–18.

The EEOC counters that it has "always acted with a proper motive[,]" *i.e.*, it "has legitimately brought, and is properly investigating, the Commissioner's Charge of discrimination." Pet.'s Brief (Doc. 102) at 6:3–7 (emphasis omitted). Further, the EEOC claims entitlement to a presumption of good faith. Insofar as the Commissioner's Charge is concerned, the EEOC asserts that the administrative process "adequately protected [Bashas'] from any perceived impropriety." *Id.* at 6:24–26 (emphasis omitted). Lastly, the EEOC argues that Bashas' has not met its burden of proving abuse of process.

### 1. Presumption of Good Faith

Preliminarily, the EEOC claims that it is entitled to a presumption that its "officials" acted in good faith, which, in turn, means that Bashas' must come forth with "irrefragable proof to the contrary." *See Id.* at 6:18–22 (internal quotation marks and citations omitted). If there is a correlation between the depth of legal analysis and how a party perceives the strength of a given argument, the EEOC must not be too serious about this argument given its abbreviated nature.

First, it did not define "irrefragable proof," despite plentiful case law examining that level of proof. *See, e.g., Armour of America v. United States,* 96 Fed.Cl. 726, 749–750 (Fed.Cl.2011) (discussing case law). The Federal Circuit and its predecessor have often used that language "to describe the quality of evidence to overcome the good faith presumption[,]" finding that it is akin to "proof by clear and convincing evidence[.]" *Id.* at 749 (internal quotation marks and citation omitted). Not only did the EEOC fail to define its terms, but it did not point to one case where a court has invoked this good faith presumption in a subpoena enforcement action such as this. Subpoena enforcement actions have their own rather unique legal framework, which varies somewhat depending upon the issuing agency, as earlier discussed. Finally, and most troubling, is that the EEOC did not bother to explain what it deems to be the impact of this presumption upon the present case.

The court surmises that the EEOC is invoking that good faith presumption because arguably it would place a higher

9. Until now, Bashas' also has been attempting to prove that the EEOC had another ulterior motive for this investigation, *i.e.*, that the EEOC was endeavoring to influence unionization efforts aimed at Bashas'. Reflective of the absence of any such proof during the hearing, Basha's closing brief does not mention that theory. Seemingly, Bashas' has abandoned that theory and, as stated above, intends to rely solely upon the purported link between the *Parra* litigation and the EEOC's investigation to prove improper motive.

burden of proof upon Bashas'. There is no need for the court to become mired down in, or definitively resolve, whether the EEOC is entitled to a presumption of good faith here. That is because assuming *arguendo* that Bashas' burden of proof is by any definition somewhat lower than "irrefragable," on this record Bashas' has not met its burden of showing abuse of process in any form.

Before addressing each of Bashas' abuse of process arguments, especially in light of the foregoing, it is necessary to reiterate Bashas' burden of proof. As explained previously, while the Ninth Circuit does not employ the four *Powell* criteria for enforcement to non-IRS summons, it recognizes that such summonses are subject to *Powell*'s proscription against abuse of process. That is because "[i]t is the court's process which is invoked to enforce [an] administrative summons and a court may not permit its process to be abused." *Powell*, 379 U.S. at 58, 85 S.Ct. 248 (footnote omitted). Examples of such abuse would be "if the summons had been issued for an improper purpose such as to harass the [respondent] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* The foregoing is not "an exhaustive elaboration of what good faith means," because at the end of the day, "still[,] the dispositive question in each case is whether the [agency] is pursuing the authorized purposes in

good faith." *Crystal v. United States,* 172 F.3d 1141, 1144–45 (9th Cir.1999) (internal quotation marks and citations omitted).

Ninth Circuit case law is not instructive on the precise nature of a respondent's burden of proof as to abuse of process or lack of good faith. Typically the Ninth Circuit has done little more than refer to that burden as "heavy." *See, e.g., Stewart v. United States,* 511 F.3d 1251, 1255 (9th Cir.2008) (quoting, *inter alia, Fortney v. United States,* 59 F.3d 117, 120 (9th Cir. 1995)) ("a 'heavy' burden is placed on the [respondent] to show an abuse of process or the lack of institutional good faith[ ]' "); *accord United States v. Stuckey,* 646 F.2d 1369, 1375 (9th Cir.1981) (noting that "as a practical matter," a taxpayer's burden is "quite hard to sustain" to show that a summons was "not issued for any legitimate purpose[ ]"). Also, in the Ninth Circuit and elsewhere, rarely does a court find that enforcement of an agency subpoena results in abuse of process.[10] Consequently, the facts of a given case do not offer much guidance either.

The court will thus look to *Garner.* There, after finding that the FDIC had satisfied the *Children's Hospital* factors, the Ninth Circuit required the respondents to come forth with "*specific* evidence of improper intent[,] ... bad faith or improper purpose[.]" *See Garner,* 126 F.3d at 1146 (citation omitted). "Absent such a showing," the Court held that "no

10. *EEOC v. First Alabama Bank of Birmingham,* 440 F.Supp. 1381 (N.D.Ala.1977), *aff'd,* 611 F.2d 132 (5th Cir.1980), is one such case. In *EEOC v. Bashas', Inc.,* 2009 WL 1783437 (D.Ariz. June 18, 2009), this court previously described *First Alabama* as involving "egregious facts ... not begin[ning] to approach" those before it. Concluding that it "would be a gross abuse of its discretion to enforce" the EEOC subpoena therein, the *First Alabama* court denied enforcement. Aside from the "substantial prejudice" to re-

spondent owing to undue and unexplained delay, that court refused to enforce that subpoena because the EEOC investigator's initial decision to issue it "was based *totally* on personal considerations, unrelated to the charges under investigation and was pursued" as a personal vendetta "to strike back" at the employer's attorney. *Id.* at 1385. Thus, even on this more developed record the court's earlier assessment of *First Alabama* remains accurate.

basis exist[ed] for refusing to enforce the subpoenas[,]" despite respondents' complaint that the FDIC issued those subpoenas for the improper purpose of harassment. *Id.* What this court gleans from *Garner* is that specificity is an integral part of a respondent's heavy burden to show abuse of process or institutionalized lack of good faith. Further, however a "heavy burden" is defined, surely it demands more than conjecture and innuendo. Finally, the need for specificity is especially acute here given that Bashas' was permitted counter-discovery, and two evidentiary hearings were held—one prior to discovery and the other after.

### 2. Bad Faith

██ Bashas' continues to insist that the EEOC undertook this investigation in bad faith, accusing the EEOC of "self-engineer[ing]" the Commissioner's Charge. Resp.'s Brief (Doc. 103) at 5:7. In particular, Bashas' contends that the testimony of Ms. O'Neill, the Regional Attorney for the EEOC's Phoenix District Office, and Mr. Rahill, an EEOC investigator, "demonstrate[s] that the EEOC generated this Commissioner Charge without any legitimate basis to investigate Bashas'[.]" *Id.* at 6:9–10. In a similar vein, Bashas' further contends that the EEOC lacked the statutory authority to initiate this investigation because "Title VII does not authorize the EEOC to initiate 'compliance reviews' of employers." *Id.* at 5:1–3 (citations omitted).

Steadfastly maintaining that it "has legitimately brought, and is properly investigating, the Commissioner's Charge of discrimination[,]" the EEOC's response is two-fold. *See* Pet.'s Brief (Doc. 102) at 6:5–7. First, the EEOC contends that "[t]he multilayered and thorough process leading to the issuance of the Commissioner's Charge adequately protected [Bashas']

from any perceived impropriety." *Id.* at 6:23–25 (emphasis omitted). Second, in passing, the EEOC mentions that a "presumption of good faith ... attaches to a Commissioner's Charge[.]" *Id.* at 6:9–10.

In contrast to some other federal agencies, the EEOC does not "possess plenary authority to demand to see records relevant to matters within their jurisdiction[.]" *Shell Oil,* 466 U.S. 54, 64, 104 S.Ct. 1621. Rather, "the EEOC's investigative authority is tied to charges filed with the Commission[.]" *Id.; see also EPA v. Alyeska Pipeline Serv. Co.,* 836 F.2d 443, 447 (9th Cir.1988) (citing 42 U.S.C. § 2000e–8(a)) (Congress has "specifically limited the EEOC's subpoena power by requiring that subpoenas ... be issued only in connection with an investigation of a charge and must be relevant to that charge.") "A charge may be filed by an aggrieved individual[,]" or, as here, "by a member of the Commission." *Shell Oil,* 466 U.S. at 63, 104 S.Ct. 1621 (citing § 2000e–5(b)). "A Commissioner may file a charge when a victim of discrimination is reluctant to file a charge for fear of employer retaliation, *see* 42 U.S.C. § 2000e–5(b); 29 C.F.R. §§ 1601.7(a), 1601.11 (2077), or when the Commissioner believes that an employer has engaged in a 'pattern or practice of discrimination,' 42 U.S.C. § 2000e–6(e), *see Shell Oil Co.,* 466 U.S. at 62, 104 S.Ct. 1621." *Federal Express,* 558 F.3d at 849. Whether filed by an individual or by a Commissioner, "[o]nce the charge is filed, '[t]he EEOC is then *required* to investigate the charge and determine whether there is reasonable cause to believe that it is true.'" *Id.* (quoting *Occidental Life Ins. Co. of Cal. v. EEOC,* 432 U.S. 355, 359, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977) (emphasis added by *Federal Express* Court) (other citations omitted)).

Consistent with the foregoing, Ms. O'Neill testified that Title VII requires the

filing of a charge "in order to investigate." Tr. (Doc. 98) at 202:1–13. Bashas' stresses, however, that when asked "what Bashas' concern" about the Commissioner's Charge was, Mr. Rahill depicted "this as . . . a compliance review." Tr. (Doc. 97) at 121:22–23. As Bashas' also stresses, Mr. Rahill explained that he "wanted the information to verify if [sic] violation took place." *Id.* at 121:23–25. That selected snippet of testimony is the sole basis for Bashas' assertion that the EEOC was conducting an impermissible compliance review. Partially because Mr. Rahill was never asked what he meant by "compliance review," and taking the record as a whole, including a description of how the entire EEOC investigative process unfolded, that excerpt does not convince this court that the EEOC was acting outside its statutory authority.

Equally unconvincing is Bashas' attempt to, in effect, depict Mr. Rahill as some sort of rogue EEOC investigator, and in turn impute institutionalized bad faith to the EEOC. Mr. Rahill did testify that he "was asked to draft the [Commissioner's] charge. Wages, Hispanic was [sic] the issues and the bases." Tr. (Doc. 97) at 105:11–12. "[W]ith that[,]" Mr. Rahill testified that he "did research." *Id.* at 105:12–13. Strictly based upon that testimony, Bashas' asserts that Rahill "testified that he was asked to manufacture a charge against Bashas' without any legitimate concerns for discrimination." Resp.'s Brief (Doc. 103) at 5:8–10. That mischaracterizes Mr. Rahill's testimony.

Based upon the manner and nature of Mr. Rahill's research in drafting the Commissioner's Charge, Bashas' further attempts to have this court infer bad faith to the EEOC in issuing that Charge. This attempt, too, is unavailing. When asked to draft the Commissioner's Charge, Mr. Rahill testified that he derived the factual

basis for it from doing internet research, such as conducting a Google search of Bashas' and looking to Hoover's, a website which Mr. Rahill agreed "provides largely financial information about companies[.]" Tr. (Doc. 97) at 106:8; 106:10–24. Additionally, Mr. Rahill looked at census data, EEO–1 data, which he conceded did not provide pay data, and, assuming availability, previous charges filed against Bashas'. *See id.* at 105:6–109:21; and 122:8–9. When squarely asked "[w]here did the pay information come from[ ]" for the Charge, Mr. Rahill frankly stated: "That was part of what Commissioner Silverman wanted in the charge. Was wages/Hispanics." *Id.* at 122:10–15.

Perhaps more independent and in-depth research would have been preferable prior to the drafting of this Commissioner's Charge. On this record, the quality of Mr. Rahill's research does not support a finding of bad faith; largely that is because he was but one link in the bureaucratic chain. When he was asked by "EEOC management[,] . . . either [Mr.] Bailey or [Ms.] O'Neill[,] . . . to draft the charge[,]" Mr. Rahill did. *Id.* at 103:17–21; 104:5–6. Mr. Rahill did agree on cross-examination that he had "no more specific charge that [he] [was] looking into [other] than . . . to investigate any possible wage discrimination against any Hispanic employee at Bashas'[.]" *Id.* at 114:15–25. As an EEOC investigator, who had been assigned to draft the Commissioner's Charge, Mr. Rahill cannot be faulted for the nature of that task. That is especially so given the administrative layers of review to which that draft Charge was subject.

After drafting a Commissioner's Charge such as the one against Bashas', it "go[es] to the district director and the regional attorney for review[,]" meaning there "were two different approvals at the local level[.]" *Id.* at 102:3–6; 111:15–18. The

Charge then is sent to EEOC "headquarters[;]" and if it was requested by a Commissioner, it "would go right to him or her." *Id.* at 102:9–14. Given this "multilayered" review process, and the lack of any specific evidence of improper intent, either from an institutional or individual standpoint, this record does not support a finding that in issuing the Commissioner's Charge the EEOC acted in bad faith. *Cf. United States v. LaSalle National Bank,* 437 U.S. 298, 315, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) (explaining that while an IRS "special agent is an important actor in the process, his motivation is hardly dispositive" when, the "review process over and above his conclusions is multilayered and thorough[ ]").

Buttressing this conclusion is Commissioner's Silverman's role in this process. Irrespective of whether she is entitled to a statutory presumption of good faith as the EEOC urges,[11] nothing in this record impugns her good faith in initiating the Commissioner's Charge against Bashas'. Ms. O'Neill testified that Commissioner Leslie Silverman, a presidential appointee, "decided that she wanted to issue a commissioner's charge on this matter." Tr. (Doc. 98) at 212:21–24. "It was her decision[,]" according to Ms. O'Neill. *Id.* at 212:24. Ms. O'Neill "assume[d]" that Commissioner Silverman knew the factual underpinnings of this Charge based upon "[t]he norm" when an EEOC commissioner initiates a charge. *Id.* at 215:21–216:3. One way an EEOC commissioner's charge is issued, as "happened in this case[,]" is that the Commissioner[ ] can decide on [her] own that "[she] want[s] to issue one[.]" *Id.* at 216:10–12. "This case was initiated by Commissioner Silverman[,]" Ms. O'Neill indicated. *Id.* at 216:16. Ms. O'Neill further testified that she and Commissioner Silverman "had conversations," and that the Commissioner "instructed [O'Neill] to have the commissioner's charge drafted[,]" and that was done. *Id.* at 219:4–8. Certainly there is nothing about the foregoing, and Bashas' did not come forth with any evidence, demonstrating bad faith on the part of the Commissioner herself.

### 3. Purpose or Motivation

After "review[ing] and clos[ing] [the] underlying charges" in *Parra,* and "chos[ing] not to intervene" therein, Bashas' accuses the EEOC of "orchestrat[ing] efforts to use its power to force Bashas' to produce [wage] information" in this action—information which this court had previously denied to the *Parra* plaintiffs. Resp.'s Brief (Doc. 103) at 6:15–18. Bashas' also denounces the EEOC for supposedly "apply[ing] continued pressure on [it] with respect to the plaintiff's pending wage claim[.]" *Id.* at 6:18–19. To substantiate its improper motive theory, Bashas' stresses both the EEOC's timing and its conduct.

### a. Timing & Time Frame of Requested Employee Data

To prove what it vehemently maintains is the "true purpose of this investigation

---

**11.** There is no indication that Bashas' is directly challenging Commissioner Silverman's good faith. But, if it is, the EEOC argues that Bashas' "has produced no evidence to overcome the presumption of good faith to which [she] is entitled." Pet.'s Brief (Doc. 102) at 7:15–17 (citation omitted). Section 2000e–5 does require, *inter alia,* that whether by an individual or a commissioner, "[c]harges shall be in writing under oath or affirmation[.]"

42 U.S.C. § 2000e–5(b); *see* 29 CFR § 1601.11(a) (Any commissioner's charge "shall be in writing and signed and shall be verified.") Bashas' has not pointed to any case law where a court has applied that presumption in an enforcement context such as this. The court therefore declines to apply that presumption here, especially because, as set forth above, there is no need to do so.

and subpoena[,] to bolster *Parra[,]*" Bashas' again relies heavily upon timing. Resp.'s Brief (Doc. 103) at 6:13–14. More particularly, Bashas' characterizes the EEOC as having "closed and reopened the underlying *Parra* charges in sync with the shortcomings in that litigation." *Id.* at 6:22–23 (emphasis omitted). Bashas' also renews its argument that the time frame of the subpoena's request for employee data evinces an improper motive by the EEOC. Despite discovery and two evidentiary hearings, Bashas' has not come forth with any specific, direct evidence corroborating that view.

In *Bashas' II*, 2009 WL 3241763, relying heavily upon testimony from the pre-discovery evidentiary hearing, this court detailed its concerns as to the timing of this EEOC investigation "generally[,]" and the temporal scope of the subpoena. *See id.* at *12–*14. The court adopts that discussion as if fully set forth herein. From an evidentiary standpoint, little has changed since *Bashas' II*. Moreover, the documentary evidence which Bashas' acquired during discovery, and upon which it now focuses, is facially innocuous and Bashas' has not directed the court to any additional proof convincing the court otherwise.

Ms. Larkin, an attorney for the *Parra* plaintiffs, testified that she "must have had a conversation with [Ms. O'Neill]" in March, 2006. Tr. (Doc. 99) at 23:16–24. The basis for that testimony was a letter Bashas' obtained through discovery, and in which it now places great stock. That March 31, 2006, letter reads as follows:

> In follow-up to conversations with Jocelyn Larkin of the Impact Fund, I am sending to you several of the pleadings from the case *Parra v. Bashas'*. Specifically, enclosed you will find the First Amended Complaint, the Order of August 29, 2005 granting in part and denying in part Plaintiffs' Motion to Certify

> the Class, Plaintiff's Supplemental Motion to Redefine and Limit the Class and to

Reconsider, and the Order of March 29, 2006, denying Plaintiffs' Motion to Redefine and Limit the Requested Class and to Reconsider the August 2005 Order. Resp.'s exh. 110 at 2. Bashas' stresses the fact of those conversations, *see* Resp.'s Brief (Doc. 103) at 7:24, but it did not prove any improper motive by the EEOC arising therefrom. Further, as is self-evident, the EEOC was being provided documents of public record. Without more, this letter creates no particular inference one way or another.

Bashas' further relies upon the following portion of an April 6, 2006 letter, also obtained through discovery:

> Pursuant to our telephone conversation, *I am enclosing several of the pleadings filed in support of Plaintiff['s] [M]otion for Class Certification* .... I am enclosing the Charges, the redacted Motion, the Confidentiality Order, my declaration which addresses the terms and conditions of employment, and the Certificate of Service, listing the many other pleadings filed in support of the Motion. We are happy to forward any other pleadings you would like to see, **subject to the restrictions of the Confidentiality Order.**

*Id.* (quoting Resp.'s exh. 110 at 3) (italicized emphasis added by Bashas') (bold emphasis added by court). Here again, there is nothing about the quoted passage from which an inference of improper motive can be drawn. Indeed, the bold highlighted language, along with the following passage which Bashas' conveniently omitted, shows that in dealings with the EEOC, *Parra*'s counsel was aware of its confidentiality obligations under *Parra*. Under these circumstances, and because there is a void in the record as to how the

foregoing directly relates to the EEOC's "re-opening" of the previously closed *Parra* charges, it would be sheer speculation to attribute any improper motive to the EEOC on this basis.

Bashas' further maintains that when the EEOC issued the May 11, 2006 subpoena in *Parra*, the EEOC "contravened its stated practice to issue subpoenas only on *open* charges." Resp.'s Brief (Doc. 103) at 8:22–23. First of all, merely acting in "contraven[tion]" of the EEOC's "stated practice" can hardly rise to the level of proof necessary to establish improper motive. *See id.* Second, to the extent Bashas' is arguing that the EEOC improperly issued that May 2006 subpoena because it was issued on closed charges, the record does not support that argument. What the record shows is that the EEOC notified Bashas' in writing "[o]n or about April 14th, 2006, ... that [it] was reopening its processing of the charges filed by Messrs. Parra and Estrada close to five years ago." Tr. (Doc. 98) at 264:19–23; *see also* Resp.'s exh. 115 at 2 (same). The record also shows that the subpoena relating to those charges was issued on May 11, 2006, *after* those charges were reopened. *See* Resp.'s exh. 114 at 1. In short, nothing about the May 11, 2006 subpoena issued in *Parra*, including its timing, persuades the court of an improper motive.

### b. Petition to Revoke

Next, Bashas' attempts to attribute an improper, ulterior motive to the EEOC based upon its handling of that May, 2006 *Parra* subpoena. After the issuance of that subpoena, on May 25, 2006, Bashas' petitioned the EEOC to revoke it. Resp.'s exh. 115. Bashas' maintains that the EEOC "ignore[d] [the] concerns" in that petition to revoke and, instead, on May 9, 2007, issued this Commissioner's Charge. *See* Resp.'s Brief (Doc. 103) at 9:11–12 (emphasis omitted).

On this record, Bashas' has not proven with the requisite degree of specificity that there was a direct casual connection between that *Parra* subpoena and the issuance of the Commissioner's Charge. Ms. O'Neill testified to the process which the EEOC follows upon receipt of a petition to revoke. The EEOC's "legal office does ... a draft determination." Tr. (Doc. 98) at 269:4–5. Pointing out that Ms. O'Neill was " 'very involved' " with that determination, seemingly Bashas' is raising the specter of some impropriety from that involvement. *See* Resp.'s Brief (Doc. 103) at 9:18–21 (quoting Tr. (Doc. 98) at 269:10). Given the absence of any concrete proof as to the nature and exact scope of Ms. O'Neill's involvement with the draft determination, the court does not draw any particular inference from that bit of testimony.

Here, as is customary, the draft determination addressing Bashas' petition to revoke was forwarded to the EEOC Commission. Tr. (Doc. 98) at 269:5–11. The next step in the administrative process is that "[a] commissioner can put that [draft determination] on hold, or the Commission 'can vote against issuing ... the determination to the employer.' " *Id.* at 269:14–16. "[I]n this case Commissioner Silverman put a hold on th[e] [draft] "determination[.]" " *Id.* at 269:16–17. Ms. O'Neill added, "that's really why the commissioner charge was filed." *Id.* at 269:17–18. Ms. O'Neill was not questioned as to what she meant by the foregoing. Furthermore, there is no record evidence, for example, as to the agency repercussions, if any, of placing a petition to revoke on hold, or how often the EEOC places a hold on draft determinations, and the court declines to speculate. So while Bashas' firmly believes that the foregoing testimony by Ms. O'Neill supports a finding that this Charge was issued for the improper mo-

tive of bolstering the *Parra* litigation, the court cannot agree. Without any further explanation, or other proof connecting Bashas' petition to revoke to the issuance of the Commissioner's Charge herein, the relationship between that petition and this Charge is simply too attenuated to support an inference of improper motive.

Admittedly, Ms. O'Neill did respond affirmatively when asked whether "the reason Commissioner Silverman asked that this charge be filed was because Bashas' petitioned to revoke a subpoena that was issued on the *Parra* and *Gonzala* [sic] charges[.]" *Id.* at 270:24–271:3. Almost immediately thereafter, when asked that question in a slightly different form, *i.e.,* was the May, 2006 subpoena "the basis of the commissioner's charge[,]" Ms. O'Neill emphatically responded, "That's not what I'm saying." *Id.* at 271:14–25. Ms. O'Neill continued, "[t]o the best of my knowledge" Commissioner Silverman had "whatever . . . was in the package" prepared in the EEOC Regional office, pertaining to that subpoena. *Id.* at 271:25–271:–3.

This manner of testifying is somewhat representative of Ms. O'Neill's overall demeanor on the witness stand. Ms. O'Neill had a rambling style of answering questions, oft-times engaging in circular reasoning and not immediately or directly answering the question asked. As she credibly testified, Ms. O'Neill also was prone to memory lapses due to her "pitiful memory[,]" which she herself described as being "like a sieve." *Id.* at 169:8; 175:7. Although perhaps somewhat paradoxical, in light of the foregoing, when Ms. O'Neill did directly answer a question, she was generally believable. Thus, her explanation that "[t]his commissioner's charge was based on a whole lot of things, and you'd have to ask Commissioner Silverman to know what all of her

bases were[,]" strikes the court as both a candid and accurate assessment of the basis for this Commissioner's Charge. The record corroborates the view that this Charge was not attributable to any single factor, let alone the petition to revoke in *Parra*.

Bashas' similarly magnified the import of Mr. Rahill's testimony in terms of trying to establish a direct causal link between its petition to revoke the May, 2006 *Parra* subpoena and the issuance of the Commissioner's Charge. Mr. Rahill did agree that during his 20 year tenure with the EEOC, he has seen "ten to 12 commissioner's charge[s][.]" Tr. (Doc. 97) at 113:15–19. Bashas' claims that "Mr. Rahill testified" that the "re-opening of charges and then issuance of a Commissioner Charge is highly unusual[.]" Resp.'s Brief (Doc. 103) at 10:11–12 (citation omitted). Mr. Rahill did not so testify, either in the cited excerpt or elsewhere. That is simply the inference which Bashas' is drawing from a fragment of Mr. Rahill's testimony. In sum, bearing in mind that Bashas' has a heavy burden at this juncture, based upon these few selected bits of testimony to which Bashas' refers, the court declines to find, as Bashas' strongly implies, that this Commissioner's Charge was issued to retaliate against it for filing a petition to revoke the May 2006 subpoena.

### c. Scope of Requests & Confidentiality Concerns

Bashas' claims that the EEOC's "refus[al] to consider Bashas' concerns about the scope of the information requests or confidentiality[ ]" also proves the EEOC's improper motive for this investigation. Resp.'s Brief (Doc. 103) at 11:14–15 (emphasis omitted). This argument is not persuasive. The EEOC did "consider" both of those concerns, but Bashas' was not satisfied with the EEOC's handling of those concerns.

On January 8, 2008, Bashas' responded to the EEOC's "December 6, 2007 Request for Information[.]" Pet.'s exh. 15 at 00001. EEOC Investigator Rahill responded by letter dated February 21, 2008, indicating, *inter alia*, "[t]o address [Bashas'] concerns regarding over broad data requests [the EEOC] ha[s] attempted to restrict the data requested as much as possible." Pet.'s exh. 13 at 1. Similarly, the EEOC ultimately provided Bashas' with a proposed confidentiality order, *see* Pet.'s exh. 14, but it was not as "protective" as Bashas' would like. *See* Resp.'s Brief (Doc. 103) at 12:19–29.

As the entire record shows, there was intransigence by both the EEOC and Bashas'. Neither seemed willing to give an inch. That strategy is a parties' prerogative, but it runs the risk, as it did here, of creating a deeply polarizing situation. The parties become so ensconced in their respective positions as to, among other issues, the scope of the requested data and the claimed need for a confidentiality order, that there was no room for compromise. Especially under these circumstances, there is an insufficient basis for equating an improper motive with the EEOC's taking of a "hard-line" approach on those two issues.

### d. Bashas' Objections to Subpoena

Also unconvincing is Bashas' assertion that the issuance of the subpoena in this case, and its objections thereto, prove improper motive. It is undisputed that Bashas' did not comply with that subpoena. The EEOC, thus, had a statutory right to file this enforcement action. 42 U.S.C. § 2000e–9. The lapse of nearly nine months between Bashas' response to this subpoena and the filing of this enforcement action does give the court pause. But it is Bashas' heavy burden, which it did not meet, to prove that that lapse is due to improper motive.

### e. Enforcement Action Timing

In granting Bashas' leave to conduct discovery, this court expressed "skeptic[ism]" that it was "simply coincidental" that after seven months of no action by the EEOC, "on [Monday] February 2, 2009– the same day this court denied discovery in *Parra* as to Bashas' post-April 2004 pay policy, the EEOC decided to file an OSC to enforce a subpoena encompassing such pay data, a subpoena which had been served over eight months earlier." *Bashas' II*, 2009 WL 3241763, at \*13 (internal quotation marks and citation omitted). The court's initial skepticism has largely been dispelled by the undisputed fact that that original OSC was filed at 11:35 a.m., Pet.'s Mot. (Doc. 46), exh. 1 thereto, whereas this court did not issue its ruling in *Parra*, denying plaintiffs' request to reopen discovery on the pay claim, until later that afternoon, at approximately 2:50 p.m. *Parra*, Doc. 277. The foregoing undermines previous suggestions by Bashas' that this OSC was filed as a direct response to the adverse ruling to the *Parra* plaintiffs. It would have been impossible for the EEOC to have known how this court would rule in *Parra* on plaintiffs' motion to reopen discovery to include Bashas' post-April 2004 wage data. Therefore, the court is now persuaded that although the time frame of this subpoena dovetails with that ruling, that is strictly coincidental.

Evidently due to that unrefuted proof, Bashas' has changed its emphasis from earlier in this litigation. Now it contends that *Parra*'s counsel, Jocelyn Larkin, "knew of both the Commissioner's Charge and the scope of information requested by the EEOC's requests for information" prior to the filing of the OSC. Resp.'s Brief (Doc. 103) at 13:9–11 (citation omitted). Supposedly, Ms. Larkin made those statements to Bashas' counsel, Ms. Quincy, dur-

ing a January 30, 2009,[12] conference call. Bashas' impliedly urges this court to infer some sort of improper motive to the EEOC based upon the foregoing, and because Bashas' first learned of this action, not from the EEOC, but from outside media sources. *See* Tr. (Doc. 41) at 90:24–93:7; and Tr. (Doc. 98) at 20:11–21:17.

The court is unable to draw an inference of improper motive from the foregoing, especially in light of the entire record. While the proof regarding that phone conference was somewhat contradictory, the court finds credible Ms. Larkin's testimony that at that particular time, she was unaware of the Commissioner's Charge. Even discrediting Ms. Larkin's testimony on that narrow point, still, Bashas' has not come forth with specific proof showing improper motive based upon the timing of the filing of this enforcement action. If anything, Ms. O'Neill's statement that "[s]ubpoena enforcements [are] a pet peeve of [hers]," and her candid admission that there are "three right now that have been sitting on [sic] lawyers' offices for many, many months[ ]" Tr. (Doc. 98) at 273:223–24, corroborates the EEOC's point early on that "[l]itigation takes precedence over subpoena enforcement matters, so that there is often a long lapse between the issuance of subpoena and its enforcement." *See Bashas' II*, 2009 WL 3241763. Delays in the bureaucratic process, without more, are not akin to an improper motive.

### f. *Parking Lot Encounters*

In the midst of Bashas' bankruptcy proceeding, the *Parra* plaintiffs propounded discovery demands upon Bashas'. Resp.'s exhs. 148–149. Viewing those demands as a means to circumvent this court's order in *Parra* declining to reopen discovery on the wage claim, Bashas' moved to quash, or alternatively, it sought a protective order. *See* Resp.'s exh. 150. On June 17, 2010, the United States Bankruptcy Court, District of Arizona, granted Bashas' motion. Resp.'s exh. 150.

On June 23, 2010,[13] Ms. Patricia Miner, an EEOC investigator, who became the lead investigator on this case after Mr. Rahill's retirement, Tr. (Doc. 97) at 86:17–87:2, testified that as "[a] mechanism to obtain investigative leads[,]" she and six other EEOC "investigators or representatives" went to parking lots at several Bashas' stores, passing out Ms. Miner's business cards. *Id.* 102:25; 100:21–22. Ms. Miner recalled "[a]pproaching individuals and indicating" that the EEOC was "conducting an investigation into allegations of discrimination involving wage and promotion for Hispanic employees." *Id.* at 103:6–9. If someone Ms. Miner approached "had any information" regarding that, or if "they knew anyone that had information," she "presented them with [her] business card and indicated that they could call [her]." *Id.* at 103:9–12.

After learning of these encounters, Bashas' immediately demanded that the EEOC refrain from such conduct. Resp.'s exh. 146. Writing directly to Ms. Miner, Bashas' raised the possibility that those encounters ran "afoul of 28 [sic] U.S.C. §§ 20003–5(b)'s requirement that 'Charges shall not be made public by the Commission.'" *Id.* at 1. Bashas' further expressed concern that these parking lot encounters "seem[ed] contrary to 28[sic] U.S.C. §§ 20003–8(e)[.]"[14] *Id.*

---

**12.** Bashas' brief indicates that call was on January 30, ***2006,*** which is obviously incorrect. *See* Resp.'s Brief (Doc. 103) at 13:11 (citation omitted) (emphasis added).

**13.** Resp.'s exh. 146 at 1.

**14.** That statute states in relevant part:

It shall be unlawful for any officer or employee of the Commission to make public in

There is nothing in Ms. Miner's testimony, or elsewhere in this record, evincing improper motive by the EEOC in connection with those encounters. Bashas' implies that there was some temporal connection between the EEOC's use of this investigative means and the Bankruptcy Court's order to quash. That is pure conjecture. There was no evidence that Ms. Miner, or any of the other EEOC investigators involved in these encounters, was aware of that order, much less its date of entry. From a timing standpoint then, these encounters were nothing more than happenstance.

Bashas' attempts to make much of Ms. Miner's acknowledgment that this is the only time in her 11 years with the EEOC where she used this investigatory tool—distributing her EEOC business cards to employees at their work site. *Id.* at 102:25; 103:14–25. However, Ms. Berta Escheveste, the "enforcement manager" in the EEOC's Phoenix Regional Office, testified that she recalled "[a]t least one other investigation" where EEOC employees were sent to parking lots to hand out business cards. *Id.* at 73:8–9; 74:18–23. Similarly, Mr. Rahill, based upon his 20 years of EEOC investigative experience, indicated that it "could be . . . appropriate to approach employees and ask them to give . . . information and explain that you're investigating a charge[.]" Tr. (Doc. 97) at 158:18–22. Although not commonplace, this record does not support a finding that the EEOC investigators' distribution of business cards to Bashas' employees in Bashas' parking lots, is tantamount to acting in bad faith or with an improper motive.

The testimony of the ten Bashas' employees who had parking lot encounters with the EEOC investigators provides further indicia of a lack of improper motive by the EEOC. Bashas' called ten of its employees who had parking lot encounters with EEOC investigators. Through those witnesses Bashas' sought to prove that the EEOC had engaged in "extremely disruptive" and "troubling conduct[,]" and that it had violated the EEOC's constraints on public disclosure of charges; hence, the EEOC acted with an improper motive. *See* Resp.'s exh. 146. Bashas' was unsuccessful on all counts.

Tellingly, in its closing brief Bashas' completely ignored the testimony of those ten witnesses. Instead, it chose to rely upon selected quotes from declarations of four of those employees. *See* Resp.'s Brief (Doc. 130) at 14:23–15:5. The reason Bashas' conveniently overlooked the testimony of those ten witnesses is transparent. None of them supported Bashas' version of events. After hearing the testimony of all ten witnesses, and assessing their demeanor, it was readily apparent that from the employees' standpoint these encounters were brief, five minutes at the outside, and fairly innocuous. In fact, shortly afterward several employees simply threw away the EEOC business cards or otherwise discarded them. *See* Tr. (Doc. 97) at 229:25–230:10; 237:5–6; and 250:22–24.

Bashas' also tried in vain to prove that the EEOC violated its own strictures against public disclosure when its investigators approached Bashas' employees. Many of the witnesses were not entirely certain as to what the investigators said to them. That uncertainty was not because the witnesses were being evasive. Rather, many of those witnesses could not recall these conversations with certainty because the encounters were so brief; time has

---

any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institu-

tion of any proceeding under this subchapter involving such information.
Resp.'s exh. 146 at 2.

passed since they occurred; and, for some, perhaps language also was an obstacle. Additionally, eight of the ten witnesses expressly denied feeling threatened or in any way concerned when they were approached by the EEOC investigators. *See id.* at 196:1–2; 200:10–14; 208:4–17; 226:7–18; 234:22–235:2; 241:20–242:7; 247:13–15; 253:8–9; and 258:22–259:1. Further, Bashas' employees uniformly testified that those encounters were one-time, isolated incidents. Since that day, no one from the EEOC has contacted any of these employees again, at all, in any way. *See, e.g., id.* at 193:10–20; 207:21–208:3; 225:24–226:6. Based upon the totality of the evidence, there is an insufficient basis for finding that the EEOC's one-time brief encounters with ten Bashas' employees was prompted by an improper motive or done in bad faith.

### g. Failure to Supplement Discovery

While conducting counter-discovery, Bashas' learned from counsel for the *Parra* plaintiffs that they had had conversations with the EEOC, *see* Resp.'s exh. 110, which the EEOC did not reference in response to Bashas' interrogatories. Pet.'s exh. 4 at 3–4. Bashas' asserts that the EEOC's failure to supplement its discovery responses in that regard contributes to a finding of improper motive.

The court disagrees. The court is all too familiar with the counter-discovery in this action, and its rancorous nature—owing to counsel on both sides. The court does not look favorably upon any party disregarding its ongoing obligation to supplement, but it is unwilling to find improper motive by the EEOC on that basis. If anything, taking into account the history of this issue, including Bashas' motion to compel, it strikes the court that there could just as easily be far more benign

reasons for the EEOC's failure to supplement.

For all of the reasons set forth herein, the court finds that Bashas' has not met is heavy burden herein. In deciding whether to enforce the EEOC's original Order to Show Cause to enforce the May 28, 2008 subpoena, this court conducted an evidentiary hearing, which encompassed Bashas' motion for leave to conduct counter-discovery. Finding that Bashas' had "made a *preliminary and substantial demonstration* of abuse[,]" this court allowed limited discovery. *See Bashas' II,* 2009 WL 3241763, at *14 (internal quotation marks and citations omitted) (emphasis in original). The court also denied without prejudice to renew the EEOC's OSC for enforcement of the subject subpoena. Bashas' then engaged in discovery for nearly a year, albeit not continuously. Thereafter, the EEOC filed the pending renewed OSC to enforce the May 28, 2008 subpoena, and another evidentiary hearing ensued.

Even with the opportunity for discovery and a second evidentiary hearing, Bashas' is in the same position as it was prior to discovery. This is particularly problematic for Bashas' because at this juncture the burden of proof is higher. Although it was a close call, Bashas' has been unable to get beyond that initial "preliminary and substantial demonstration of abuse," and to clear the high hurdle necessary to prove "an abuse of process or the lack of institutionalized good faith." *See Fortney,* 59 F.3d at 120 (internal quotation marks and citation omitted).

The EEOC's conduct preceding this particular investigation and throughout may be depicted in many ways. The EEOC has been aggressive. Its process was not always fully transparent; and at times it

did not always act promptly.[15] In some ways, the EEOC's conduct can even be described as unseemly. The court will not speculate as to how the EEOC conducts its affairs in other actions. In this particular action, however, the court is left with the distinct impression that its Phoenix Regional Office is anything but a tightly run ship. None of the foregoing, however, obviates one overriding factor: Bashas' did not meet its burden of proving abuse of process or lack of institutionalized good faith. This court cannot impute bad faith where it has not been substantiated with the requisite degree of proof. Nor, in the absence of any specific proof, will the court presume a direct causal connection between the EEOC's actions herein and the *Parra* litigation, and, in turn, abuse of process or bad faith by the EEOC.

Having found that Bashas' did not meet its burden on the issue of bad faith, necessarily, the court rejects Bashas' assertion that enforcement of this subpoena would result in an abuse of this court's process. Consequently, there is no basis for this court to deny enforcement of the May 28, 2008, subpoena in its entirety. Given the court's earlier expressed concerns as to over breadth, it will return to the issue of possible modification of the subpoena.

## IV. Modification

Although the court is ordering enforcement of the May 28, 2008, subpoena, it is narrowing that subpoena. The court is excluding from that subpoena the EEOC's request for "sex of employee;" "union

code;" "union id number"; and "union eligibility date." *See* Pet's. exh. 3 at 00003–00005. Further, if Bashas' does not use some of the requested fields, *i.e.*, they fields are unpopulated, Bashas' shall so advise the EEOC in writing. Obviously, Bashas' cannot produce data which it does not have. *See EEOC v. Aaron's, Inc.*, 779 F.Supp.2d 754, 759–60 (N.D.Ill.2011) (internal quotation marks and citation omitted) ("If Aaron's does not have the requested records, of course it would be excused *pro tanto.*") Finally, because it has found that it would be unduly burdensome to Bashas' to produce requested data for certain years, the court will shift to the EEOC the cost and labor associated with obtaining accurate requested data, as narrowed, from May 1, 2004 through December 31, 2007. Bashas' shall make available that data available to the EEOC at Bashas' place of business. Bashas' must provide to the EEOC, however, the subpoenaed data, as narrowed, from January 1, 2008 forward in electronic format.[16]

## V. Confidentiality Order

Lastly, given the unique situation which this subpoena enforcement action presents, the court will require the parties within ten (10) days of the date hereof to file with the court, for its review and approval, a joint proposed confidentiality order.

For all of the reasons set forth herein, the court hereby ORDERS that:

(1) the "Renewed Application for an Order to Show Cause Why an Administrative

---

**15.** Arguably this lack of timeliness, at least in some instances, inured to Bashas' benefit because matters lay dormant in the EEOC's regional office, requiring little or no response from Bashas' during those times.

**16.** A literal reading of the subpoena suggests that the time frame is "for the period May 1, 2004 to present date[,]" *i.e.*, the subpoena date of May 28, 2008. *See* Pet.'s exh. 3 at

00002. Given Bashas' willingness to produce "electronic data [for] only those years for which [it] can provide accurate data without additional efforts to manually update its employee database—2008 *to present[,]*" the court will require Bashas' to do so. *See* Resp.'s Brief (Doc. 103) at 23:11–12 (emphasis added).

Subpoena Should not be Enforced" by the Equal Employment Opportunity Commission shall be **GRANTED** as modified herein; and

(2) within ten (10) days of the date hereof the parties shall file with the court, for its review and approval, a joint proposed confidentiality order.